# EXHIBIT A

Confidential

1          UNITED STATES DISTRICT COURT

2         CENTRAL DISTRICT OF CALIFORNIA

3

4    _____

5    STOP STARING DESIGNS, a              )

6    California corporation,              )

7                   Plaintiff,            )

8    vs.                                  )  No. CV09-02014

9    TATYANA, LLC, a Nevada               )      DSF-AJW

10   corporation d/b/a BETTIE PAGE        )

11   CLOTHING; TATYANA KHOMYAKOVA,        )

12   an individual; JAN GLASSER, an       )

13   individual; and Does 1 through       )

14   10, inclusive,                       )

15                   Defendants.          )

16   _____     )

17        CONFIDENTIAL - ATTORNEYS' EYES ONLY

18

19       Videotaped Deposition of JAN H. GLASER,

20       taken at 4000 MacArthur Boulevard, Suite

21       1100, Newport Beach, California, commencing

22       at 9:23 a.m., Thursday, July 22, 2010,

23       before Catherine A-M Gautereaux, CSR No. 3122.

24

25   PAGES 1 - 268

**CERTIFIED TRANSCRIPT**

RECEIVED

AUG 1 1 2010

Browne Woods George LLP

Page 1

EXHIBIT A

Confidential

```
 1    APPEARANCES:

 2

 3       FOR PLAINTIFF:

 4

 5            BROWNE WOODS GEORGE LLP

 6            BY:  KEITH J. WESLEY, ESQ.

 7            2121 Avenue of the Stars, Suite 2400

 8            Los Angeles, California 90067

 9            (310) 274-710  fax (310) 275-5697

10            kwesley@bwgfirm.com

11

12       FOR DEFENDANTS:

13

14            ONE LLP

15            BY:  CHRIS ARLEDGE, ESQ.

16            4000 MacArthur Boulevard

17            West Tower, Suite 1100

18            Newport Beach, California 92660

19            (949) 502-2670  fax (949) 258-5081

20            carledge@onellp.com

21

22       ALSO PRESENT:

23            JOANN YAGER, Videographer

24

25
```

Page 2

Confidential

```
1            THE WITNESS:  I don't know.  I think they're        13:07
2    bigger than we are, substantially 'cause they've been       13:07
3    around a long time, but that's anecdotal on my part.  I     13:07
4    don't know.                                                 13:07
5    BY MR. WESLEY:                                              13:07
6        Q    What contracts, if any, has Stop Staring           13:07
7    caused third parties to break with your company?            13:07
8        A    Purchase orders, not really contracts.  There      13:07
9    was one to a company called -- and you'll have to           13:08
10   forgive me here.  It's either Mars and Venus or Venus       13:08
11   and Mars -- in Edmonton, Alberta, Canada, that was a        13:08
12   fairly -- like $16,000, about three years ago, that they    13:08
13   placed at Magic -- the Magic trade show, then came back     13:08
14   after visiting Stop Staring and canceled it and said,       13:08
15   you know, that they -- they're not gonna carry both         13:08
16   lines; that they were told, if they carried us, they        13:08
17   couldn't carry them.                                        13:08
18       Q    Who did the Mars and Venus representative          13:08
19   speak to at Bettie Page Clothing?                           13:08
20       A    You know, one of our people at the booth.  And     13:08
21   I don't recall them.                                        13:08
22       Q    It wasn't you?                                     13:08
23       A    It was not me.                                     13:08
24       Q    Any other contracts that you feel that Stop        13:08
25   Staring has caused third parties to break with Bettie       13:08
```

Page 117

Confidential

```
 1                  DECLARATION UNDER PENALTY OF PERJURY

 2

 3          I declare under Penalty of Perjury that the

 4      foregoing is my Statement Under Oath and are the

 5      questions asked of me and are my answers hereto; that

 6      I have read same and have made necessary corrections,

 7      additions, or changes to my answers that I deem

 8      necessary.

 9

10          In witness whereof, I hereby subscribe my name

11      this _____ day of _____, _____.

12

13

14

15                   _____

16                        JAN H. GLASER

17

18

19

20

21

22

23

24

25

                                                     Page 261
```

Confidential

```
 1                    CERTIFICATE

 2                         OF

 3           CERTIFIED SHORTHAND REPORTER

 4

 5          The undersigned Certified Shorthand Reporter

 6    and deposition officer of the State of California does

 7    hereby certify:

 8          That the foregoing deposition was taken before

 9    me at the time and place therein set forth, at which

10    time the witness was duly sworn by me:

11          That the testimony of the witness and all

12    objections made at the time of the deposition were

13    recorded stenographically by me and were thereafter

14    transcribed, said transcript being a true and correct

15    copy of the proceedings thereof.

16          In witness whereof, I have subscribed my name

17    this date:  August 2, 2010.

18

19

20

21    _____

22          Catherine A-M Gautereaux
              Certificate No. 3122
23

24

25
```

Page 262

# EXHIBIT B

Attorneys' Eyes Only

```
 1          UNITED STATES DISTRICT COURT

 2          CENTRAL DISTRICT OF CALIFORNIA

 3     --------------------------------

 4     STOP STARING! DESIGNS, a          )      CERTIFIED

 5     California corporation,           )      TRANSCRIPT

 6          Plaintiff,                   )

 7     vs.                              )      Case No.

 8     TATYANA, LLC, a Nevada           )      CV 09-02014

 9     corporation d/b/a/ BETTIE PAGE   )      DSF (AJWx)

10     CLOTHING; TATYANA KHOMYAKOVA,    )

11     an individual, JAN GLASER, an    )

12     individual; and Does I through   )      RECEIVED

13     10, inclusive,                   )

14          Defendants.                 )      SEP 1   2010

15     ------------------------------)          Browne Woods George

16     AND RELATED COUNTERCLAIMS.       )

17     --------------------------------

18        CONFIDENTIAL - ATTORNEYS' EYES ONLY

19     Deposition of TATYANA KHOMYAKOVA, taken

20     at 1640 West Alta Drive, Suite 4, Las

21     Vegas, Nevada, commencing at 9:11 a.m.,

22     Friday, August 27, 2010, before Janet C.

23     Trimmer, RPR, CRR.

24

25     PAGES 1 - 185

                                        Page 1
```

EXHIBIT B

Attorneys' Eyes Only

```
 1    APPEARANCES:

 2

 3    FOR THE PLAINTIFF:

 4          BROWN WOODS GEORGE LLP

 5          BY: KEITH J. WESLEY, ESQ.

 6          2121 Avenue of the Stars

 7          Suite 2400

 8          Los Angeles, California 90067

 9          (310) 274-7100

10          kwesley@bwgfirm.com

11

12    FOR THE DEFENDANT:

13          ONE LLP

14          BY: CHRIS ARLEDGE, ESQ.

15          4000 MacArthur Boulevard

16          West Tower, Suite 1100

17          Newport Beach, California  92660

18          (949) 502-2872

19          carledge@onellp.com

20

21    ALSO PRESENT:

22          SIRANOUSH SAROYAN, RUSSIAN INTERPRETER

23           (Morning session only)

24          JAN GLASER (Afternoon session only.)

25
```

Page 2

Attorneys' Eyes Only

1       Q.   What company is the company in Canada?

2       A.   Something Lotos, L-o-t-o-s.  I don't know

3   exactly.  And they also put a big purchase order, and

4   they call and they cancel everything.

5       Q.   And so now they are with Stop Staring?

6       A.   Yes.

7       Q.   Any other customers that you can think of off

8   the top of your head that cancelled contracts because

9   of Stop Staring?

10      A.   The problem is I don't remember the names if

11  you need exact names, you know.  One company from

12  California, they place a big order like about $20,000,

13  they were very happy, they like everything, then they

14  went to the Stop Staring booth, it was at the MAGIC

15  show, and then in like 20 minutes came back and said

16  we want to cancel all the order.

17      Q.   Do you know why they decided to cancel?

18      A.   I know why.  Because Stop Staring told them

19  not to.

20      Q.   Who told you that?

21      A.   That's very easy to guess.

22      Q.   Where did you grow up?

23      A.   Where?  In Russia.

24      Q.   What part?  What city?

25      A.   St. Petersburg.

Page 162

Attorneys' Eyes Only

DECLARATION OF DEPONENT

I, TATYANA KHOMYAKOVA, deponent herein, do hereby certify and declare under penalty of perjury the within and foregoing transcription to be my deposition in said action; that I have read, corrected and do hereby affix my signature to said deposition.

_____

TATYANA KHOMYAKOVA, Deponent,

Dated:_____

Page 180

Attorneys' Eyes Only

1    I, the undersigned, a Certified Shorthand

2  Reporter of the States of Nevada and California,

3  Registered Professional Reporter, and Certified

4  Realtime Reporter, do hereby certify:

5    That the foregoing proceedings were taken

6  before me at the time and place herein set forth; that

7  any witnesses in the foregoing proceedings, prior to

8  testifying, were duly sworn; that a record of the

9  proceedings was made by me using machine shorthand

10 which was thereafter transcribed under my direction;

11 that the foregoing transcript is a true record of the

12 testimony given.

13    Further, that before completion of the

14 proceedings, review of the transcript was requested.

15    I further certify I am neither financially

16 interested in the action nor a relative or employee

17 of any attorney or party to this action.

18    IN WITNESS WHEREOF, I have this date

19 subscribed my name.

20 Dated:   9-13-2010

21

22

23

24
_____

JANET C. TRIMMER, RPR, CRR
NV CCR No. 864, CA CSR 4008

25

Page 181

# EXHIBIT C

```
 1              UNITED STATES DISTRICT COURT

 2              FOR THE DISTRICT OF OREGON

 3

 4   STOP STARING! DESIGNS,          )

 5                                   )
                        Plaintiff,   )
                                     )
 6              vs.                  )  Civil Action No.
                                     )  2:09-cv-02014-DSF-AJW
 7   TATYANA, LLC, et al,            )
                                     )
 8                      Defendants.  )
                                     )
     _____)
 9

10

11

12

13

14

15         DEPOSITION OF BERNADETTE DEXTER

16       Taken in behalf of the Defendants

17                June 28, 2010

18

19

20

21

22

23

24

25   Pages 1 - 208
```

**CERTIFIED TRANSCRIPT**

Page 1

EXHIBIT C

1       BE IT REMEMBERED THAT, pursuant to Federal Rules of
2   Civil Procedure, the deposition of BERNADETTE DEXTER was
3   taken before Sherry Thi Lindsay, a Notary Public and Court
4   Reporter for the State of Oregon, on June 28th, 2010,
5   commencing at the hour of 10:11 a.m., in the offices of
6   Teach Reporting, Inc., 1500 SW First Avenue, in the City
7   of Portland, County of Multnomah, State of Oregon.
8
9                           APPEARANCES:
10
11  For Plaintiff:
    Ms. Cheryl Priest Ainsworth
12  Browne Woods George, LLP
    2121 Avenue of the Stars, Suite 2400
13  Los Angeles, CA 90067
    Telephone:  (424)202-5565
14  E-mail:  Cainsworth@bwgfirm.com
15
16  For Defendent - Bettie Page Clothing:
    Mr. Imran F. Vakil
17  One LLP
    4000 MacArthur Boulevard
18  West Tower, Suite 1100
    Newport Beach, CA 92660
19  Telephone:  (949)502-2876
    E-mail:  Ivakil@onellp.com
20
21
22
23
24
25

                                            Page 2

1    told you?

2        A    I can't remember, besides Audrey, because I

3    keep in touch with her.  I can't remember, honestly, I

4    can't.

5             MR. VAKIL:  We're going to go off the record.

6                (Discussion held off the record.)

7    BY MR. VAKIL:  (Continuing)

8        Q    So just before we took a break, the last thing

9    we were talking about is Stop Staring! asking different

10    companies to take down your image.  If I am not mistaken,

11    you said at that time, you can't remember.  But now that

12    you have a few minutes, I was wondering if you recalled

13    any of the companies?

14        A    The biggest one, like I said, was Daddy-O's,

15    because I was all over their site.  I mean, people would

16    walk up to me and be like, you are the Daddy-O's girl.

17    Like they just knew me as their model.  And there were

18    several others besides Audrey K.  I am trying to think

19    who else.  Honestly, I can't even remember.

20          It was like anybody who had used the images

21    that I was wearing the dress, if they pulled those

22    images, that was because they were told to pull the

23    images.  And everything that I ever reshot, even what was

24    just shot like a month before this all happened, like,

25    was pulled and it was reshot on another model and the

Page 57

```
 1    head was chopped off.

 2         Q    I believe you're prior testimony is that Stop

 3    Staring! asked everywhere your image was to take down the

 4    images?

 5         A    Yes.

 6         Q    Did this include non Stop Staring! companies?

 7              MS. AINSWORTH:  Objection; calls for

 8    speculation.

 9    BY MR. VAKIL:  (Continuing)

10         Q    Companies who didn't carry Stop Staring!?

11              MS. AINSWORTH:  Objection; calls for

12    speculation.

13              THE WITNESS:  No.  I would just say anyone that

14    she -- because she doesn't care about anything but Stop

15    Staring!, so it would be just anybody that was carrying

16    the clothing that I had modeled or she had given them the

17    images to use for their website.

18    BY MR. VAKIL:  (Continuing)

19         Q    Let's talk about some of the information that

20    was shared by Stop Staring!.  You had previously

21    testified that you met with her a few times, I believe

22    three.

23         A    At least three times, yeah.

24         Q    At least three times.  Did Stop Staring! ever

25    put a confidentiality agreement in front of you and ask
```

Page 58

1  was just copying those dresses and saying that she was

2  original.  She is saying she is all original and

3  everybody is ripping her off, well, they are not.

4  Everybody is using old patterns.

5  I mean, I wish I had saved pictures.  I should

6  have printed them out, but I didn't know I was going to

7  be here.  But I think that's why I was just getting so

8  irritated.  I could just go side by side, that's what it

9  is.  And I could understand Alicia getting upset because

10  there is some competition, but she doesn't own half the

11  stuff that she has produced, because it is reproduction

12  of something that was made before.  And anybody can use

13  those patterns.  That's, I think, what I am referring to.

14       Q    Are you aware of any other circumstances where

15  Alicia has lied to you?

16            MS. AINSWORTH:  Objection; misstates the

17  evidence.

18            THE WITNESS:  I don't know if I can think of

19  anything where she has, like, blatantly lied to me.  I

20  can honestly say I always took everything she said with a

21  grain of salt, just because I don't know her that well.

22  BY MR. VAKIL:   (Continuing)

23       Q    Let's scroll down a little bit.  There is a

24  line on the second paragraph, the last sentence, "She

25  also called Daddy-O's and other places told them not to

Page 95

```
 1    use me as a model."

 2         A    Uh-huh.  And it's funny because I wouldn't have

 3    written that if I hadn't had -- if I hadn't known for

 4    sure.  And I honestly can't remember how I knew if they

 5    told me or somebody else told me, but, yeah.  There were

 6    a few places that were letting me know that I was not

 7    going to be modeling for them anymore and that Daddy-O's

 8    was one of them.  And, honestly, I have no proof, because

 9    I don't remember -- like I said, I didn't know I was

10    going to be here or I would have written it all down.

11         Q    After your image was taken down from Daddy-O's

12    and a number of other places, did that harm your modeling

13    career?

14              MS. AINSWORTH:  Objection; calls for

15    speculation.

16              THE WITNESS:  I'd say in a way it does, because

17    me doing all that work, it's the exposure of being

18    everywhere to make people familiar with who you are.  But

19    in a way, it enhanced my career because I have gotten

20    more paying jobs.

21    BY MR. VAKIL:  (Continuing)

22         Q    Let's go over to the next paragraph.  Again,

23    last sentence -- actually it's the last clause in the

24    last sentence.  It says, "Alicia is a manic" --

25         A    She is.
```

Page 96

```
1    models that you see on every other site and I think we're
2    starting to fall into that with you.
3              And you testified that in spite of the
4    objective statements that he has made here that you're
5    100 percent positive that it's purely because Alicia told
6    them to take everything down that you're in it?
7         A    Uh-huh.
8         Q    Why do you know that?
9         A    Why do I know that?  Because it all happened at
10   exactly the same time.  And I was told by other people
11   that Alicia said not to use me as a model.
12        Q    You weren't told by Bob Berry; right?
13        A    No.  But I am just saying that I was told by
14   other people that I was to -- that they were not even to
15   use me as a model.  Point blank, don't use her as a
16   model.  Not just don't put her in Stop Staring!, but
17   don't use her as model.
18        Q    But that's not what Bob Berry is saying.
19        A    Well, of course he is not going to say that.
20        Q    Well, he is giving you two reasonable
21   explanations.  You're saying Bob Berry is a liar?
22        A    Oh, no, I'm not saying Bob Berry is a liar.
23   I'm saying he is dancing around the issue because he
24   wants to please Alicia, because he is getting a better
25   deal on clothing than everybody else is on his wholesale
```

Page 173

1        A    A million percent, yes.

2        Q    And you also previously testified when I asked

3    you why those documents were forwarded -- and correct me

4    if I am wrong here, that you thought that Stop Staring!

5    was harming Bettie Page's business and that you felt that

6    it was important to share that information with Bettie

7    Page?

8        A    Yes.

9        Q    Did you feel it was your ethical obligation to

10   do so?

11       A    Yes, I did.

12       Q    Did you feel that what Stop Staring! was asking

13   of different retailers was unethical?

14       A    I did.

15       Q    Now, it was a Magic show that you also

16   testified about with Ms. Ainsworth in which you are aware

17   that there were two booths, Stop Staring! and Bettie

18   Page's; correct?

19       A    Yes.

20       Q    And there were retailers and other individuals

21   who were running to Stop Staring!'s booth and Bettie

22   Page's booth and then orders were being canceled for

23   Bettie Page?

24       A    Yes.

25       Q    Do you know which stores were canceling orders?

                                              Page 194

1        A    I am trying to remember.  I know I am not being

2    very helpful, because I can't remember.  But I clearly

3    remember orders being canceled and just the people coming

4    over and saying, oh, my God, we were just at the Stop

5    Staring! booth and they said if we placed an order with

6    you, we can't buy from them.  And they said she was

7    really losing it over there, which I believe, because I

8    have seen her.

9        Q    You witnessed this?

10       A    Yeah, I witnessed this.  I saw it going on

11   while I was at the Bettie Page booth.

12       Q    Now, you may not remember the name of the

13   source individually, but do you remember how many

14   different stores, approximately, canceled their orders?

15       A    From what I saw, I might say like six right

16   there on the spot.  And mainly because of their fear of

17   not being able to carry Stop Staring!, because Stop

18   Staring! was such a strong brand for their store.  And

19   Bettie Page was so new, a lot of people were afraid to

20   lose that business.

21           MR. VAKIL:  Okay.  Thank you very much and I

22   believe Ms. Ainsworth is going to have some follow-up

23   questions for you right now.  But do you mind if -- let's

24   go ahead and turn it over for her.

25           I was going to do some protocol -- talking

Page 195

1   (NB:  As a matter of firm policy, the stenographic notes and computerized backup of this transcript will be

2   destroyed 5 years from the date appearing on the following certificate, unless notice is received otherwise from any

3   party or counsel hereto on or before said date of the 2nd day of July, 2015.)

4

5   STATE OF OREGON    )
                       ) ss.

6   COUNTY OF MULTNOMAH )

7

8       I, Sherry Thi Lindsay, a Notary Public and Court Reporter for the State of Oregon, do hereby certify that,

9   pursuant to Federal Rules of Civil Procedure, BERNADETTE DEXTER appeared before me at the time and place

10   mentioned in the caption herein; that the witness was by me first duly sworn on oath, and examined upon oral

11   interrogatories propounded by counsel; that said examination, together with the testimony of said witness,

12   was taken down by me in stenotype and thereafter reduced to typewriting; and, that the foregoing transcript, Pages

13   1 to 206, both inclusive, constitutes a full, true and accurate record of said examination of and testimony by

14   said witness, and of all other proceedings had during the taking of said deposition, and of the whole thereof.

15

16       Witness my hand at Portland, Oregon, this 2nd day of July, 2010.

17

18

19

20   _____
    Sherry Thi Lindsay

21   Notary Public for the State of Oregon
    Notary No. 449189

22   My Commission expires: 5/22/14

23

24

25

OFFICIAL SEAL
SHERRY THI LINDSAY
NOTARY PUBLIC-OREGON
COMMISSION NO. 449189
MY COMMISSION EXPIRES MAY 22, 2014

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16    I hereby certify that I have read the deposition taken

      June 28, 2010 and that this deposition, together with any

17    corrections or additions, is a true and accurate record of

      my testimony:

18

                                          _____

19                                        Witness' Signature

20

21

22

23

24

25

Page 208

# EXHIBIT D

# catchword

Expert Report by Laurel A. Sutton

Case No. CV 09-02014 DSF

February 1, 2011

STOP STARING! DESIGNS, a California corporation,

Plaintiff,

vs.

TATYANA, LLC, a Nevada limited liability company d/b/a/ BETTIE PAGE CLOTHING et al.

Defendants



EXHIBIT D

I. INTRODUCTION
A.    Qualifications

1. My name is Laurel Sutton. I am a naming and branding expert and the co-
founder of Catchword. I have been professionally employed in the practice of
developing and evaluating product, company, and service names since 1997. A
copy of my curriculum vitae is attached as Appendix A to this report.

2. I have provided services as an expert witness in the general areas of naming,
branding, and domain name analysis since 2007 in both the State and Federal
courts, most recently in S. Trademark App. No. 77/106,782, and in U.S.
Trademark Opposition No. 91179273 to U.S. Trademark App. No. 77/102,551.

3. I have given numerous presentations at the national and local levels on
naming and branding.  I currently blog for Fast Company on naming and
branding. I am a member of INTA.

B.    Assignment
4. I have been asked by Counsel for the Defendants to offer rebuttal testimony to
the expert reports of Robert Wunderlich and Gary Frazier in my areas of
expertise.  Specifically, Mr. Frazier asserted in his report that Defendants
emulated the trade dress used by Stop Staring!, which likely confused
customers, leading to harm to Stop Staring! and a benefit to Defendants.  In
addition, Mr. Wunderlich conducted a damages analysis that purports to provide
guidance as to the damages suffered by Stop Staring! if the judge or jury
concludes that Defendants misappropriated the alleged Stop Staring! trade
secret at issue, which here was the idea to use the name "Bettie Page" on
Defendants' business.  Thus, as part of my work, I analyze the Defendants' use
of the name "Bettie Page," the uniqueness of that brand name, the value of the
idea to use the name "Bettie Page," and the parties' use of trade dress in their
catalogs and websites.  I have not otherwise been asked to provide monetary
damages calculations.

5. In conducting my analyses I have reviewed various sources of information,
including Stop Staring! catalogs, Bettie Page Clothing catalogs, and screenshots
of both companies' websites. I have also reviewed various legal documents
relating to this case.

C.  Summary of Opinions

6. In my opinion, the trade dress which Stop Staring! claims it owns and alleges
was infringed is not unique or distinctive, Stop Staring! did not undertake any real
effort to build or protect the trade dress, and while a consumer confusion survey
is the proper method for determining whether confusion exists, in my expert
opinion I think it is very unlikely that Defendants' use of allegedly similar trade
dress would cause confusion in the consuming public.  Further, the brand name

"Bettie Page" cannot be considered unique or a trade secret, and the mere idea to use this iconic name has very little, if any, value.

II ANALYSIS

D.      On the Trade Dress of Bettie Page Clothing and Stop Staring!

7.  In my job as a naming and branding expert, I often advise clients on how to build and protect their brand. First, the client should choose a unique name and unique visual identity, including colors and graphic designs. Second, the client must properly use the brand.  Registering a trademark is an essential step, but protecting a brand requires much more. A company needs to use its brand – the name, logo, and trade dress – in a consistent way and on every piece of promotion, including catalogs, websites, business cards, flyers, and any additional collateral.

8. Here, Stop Staring! claims to own trade dress in certain iconic colors, shapes, designs, and modeling choices, specifically: a pink and light green color scheme, a series of stars with uniform shapes but different sizes that appear to shoot out thin rays of light, a green boomerang shape set on top of a pink background with writing superimposed on top of the green boomerang, and pictures of curvaceous women models in 1940s/1950s retro-style dresses, with 1940s/1950s retro-style hair and makeup, striking seductive poses and set in front of solid-colored, pastel backgrounds.  Stop Staring! alleges that Defendants' use of similar colors, shapes, designs, and modeling choices is an infringement of its trade dress.

9. In my opinion, Stop Staring! has not built or protected a brand.  First, it has not used any unique visual identity for its alleged trade dress.  The individual elements of the trade dress are familiar elements of 1950s design.
   - Pastel colors were popular for appliances, furniture, paint, wallpaper, and clothing.
   - The space-age starburst image was used in many places in the 1950s: as the symbol for Ford's top-of-the-line Lincoln automobile, for First National City Bank, for the TV program Playhouse 90, in the first Sheraton hotel chain, on jewelry, wall clocks, dishes, and perhaps most famously, on the "Welcome to Las Vegas" sign.
   - Boomerangs were perhaps the most iconic symbol of the 1950s, appearing in fabric patterns, floor lamps, coffee tables, corporate logos (Chrysler being the most prominent), and furniture, including the "butterfly chair".
   - Retro-dressed and styled models are simply recreations of actual photos of models from the 1950s. Red lipstick was a preferred color in the 1950s; the poses of the models are very similar to period photos of models such as Bettie Page.

(More information on 1950s styles can be found at http://www.retroplanet.com/blog/retro-design/retro-decorating-ideas/1950s-

decorating-style/, and in the book "Populuxe" by Thomas Hines, published in 1986.)

10. Even in combination, the elements do not create a unique trade dress or brand. In fact, they closely resemble actual advertisements from the 1950s. [Examples attached in Appendix B] Other vintage clothes retailers use similar styles on their websites, including PinUpGirlClothing.com, Daddy-O's, MyBabyJo.com, Starlet & Harlots, etc. A search of sites like iStockPhoto and Shutterstock turns up many retro illustration files using exactly these elements (boomerangs, starbursts, pastel colors). [Examples attached in Appendix C]

11. As a branding expert, I would not advise a client to use trade dress like that alleged by Stop Staring!, if they wanted a trade dress that was ownable and protectable. Because the alleged trade dress is so lacking in uniqueness, there would be no reason to believe that consumers would ever associate the common design elements with the client's business.

12. In addition, even a unique trade dress is valuable only to the extent that it is properly used. But Stop Staring! did not build or protect its alleged trade dress here. Perhaps most importantly, Stop Staring! did not use this particular trade dress in a consistent manner. Prior to 2005, Stop Staring! catalogs used white backgrounds. The Stop Staring! catalog from 2004 used only the starbursts and boomerangs, while the Stop Staring! catalog from spring 2005 used only pink stripes.

13. Prior to 2004, Stop Staring! did not appear to use this particular trade dress on their website. A review of captured pages at Archive.org shows several different website designs from 2000 through 2004, using different background colors, design elements, and photos of models. This particular trade dress seems to be used starting in mid-2004.

14. Subsequent to 2005, Stop Staring! changed the colors, shapes, and design elements of their catalogs and website completely. The colors pink and green, the boomerang and starburst shapes, and pastel backgrounds for photographs were no longer used. Stop Staring! catalogs from the years following 2005 used blue backgrounds, or natural settings for the photographs. In October of 2006 Stop Staring! changed to a solid pink background for the home page of their website, and then in September of 2007 they changed to a completely new look with a black background. The current look, with a dark blue background, did not appear until February 2008.

15. In my opinion, Stop Staring! did not build or protect their alleged trade dress. They did not have a unique visual identity and they did not use it consistently; in fact, they changed it constantly on both catalogs and their website. It would have been difficult for consumers to associate the Stop Staring! brand with any particular visual identity.

16. The valid, scientific way to determine whether customers identified a
particular trade dress with a company or whether that trade dress is confusingly
similar to another company's trade dress is through a proper consumer survey.
Without such a survey, even an expert opinion like mine can only be tentative.
That said, as an expert in the field, as someone who makes her living helping
client's build and protect their brands, Stop Staring! did not do those things
necessary to build and protect trade dress, and it is very difficult to imagine that
customers associated these non-unique design elements with Stop Staring!.

17. Indeed, it appears that Stop Staring! itself recognized that there was no
valuable trade dress here.  While Stop Staring! now claims that this alleged trade
dress was an important part of its brand, it never registered the trade dress –
even though it registered the trademark "Stop Staring!" for various types of
women's clothing. In addition, the trademark it registered for its name and logo
does not include colors or shapes. Finally, Stop Staring! failure to use the trade
dress consistently and eventual decision to scrap it entirely is inconsistent with
an effort to build and protect a brand.  In my experience, companies that believe
they have valuable trade dress do not behave in this fashion.

18. It is also important to note that while Bettie Page Clothing used similar design
elements on some of its catalogues and on its website, Bettie Page Clothing also
used many different design elements besides starbursts and boomerangs,
including triangles, squares, polka dots, and diamonds on pastel backgrounds.


19. In sum, the trade dress used by Stop Staring! is not unique, and the use of
similar, but not identical, trade dress by Bettie Page Clothing is not likely to cause
confusion between the two companies. Consumers are more likely to assume
both companies are using well-known 1950s design elements to evoke a retro
feel. The Plaintiffs made no effort to build or protect unique trade dress.  If Stop
Staring! had been a client of mine, I would have advised the company that it had
no valuable trade dress, and I would have encouraged the company to develop a
new, unique look and feel.

E.      On the brand name "Bettie Page"

20. The Defendants have licensed the name "Bettie Page" to use as the brand
name for their line of clothing. Bettie Page was a real woman who became
famous as a model and pin-up girl in the 1950s. She stopped modeling in 1959
and fell into obscurity, but her name and image became popular again during the
1980s. Images of her were republished by several publishers, and a magazine
called "The Betty Pages", started in 1987, sparked a worldwide interest in her.
There was even a line of comic books published by Dark Horse Comics in the
1990s which recounted her fictional adventures.

21. Subsequently several books and movies appeared about her life as a pin-up girl. Her name and face (with her distinctive black hair, bangs, and blue eyes) became iconic and closely associated with a certain 1950s fashion style for women, specifically tight dresses cut to reveal cleavage, very high heels, and modeled in a playful, sexy manner.

22. By the year 2000, the name Bettie Page was synonymous with 1950s pin-up girls and 1950s fashion. Her name, as a brand, would have been an obvious choice` for any clothing retailer or manufacturer that wanted to emulate her style. Ms. Page, however, obviously owned the rights to use her name on a business or products and she had hired a company to handle the licensing of her name, and this would have been the main barrier to using her name as a brand.

23. Given Bettie Page's popularity, the choice to use her name for a retro-style clothing company was an obvious one, which had likely occurred to many other people over the years. However, since Bettie Page would permit use only through licensing, the "idea" of using her name is essentially worthless unless a licensing deal was in place. Unauthorized use of her name would be infringement, and quickly shut down by the licensing company.

24. Stop Staring! never attempted to acquire licensing rights to the Bettie Page name and therefore cannot claim any rights to it.

25. Name development is much more than simply coming up with a single name suggestion. My company, Catchword, develops names as its main line of business. The process takes 4-6 weeks and our standard fee for one name is US$40,000. The process includes developing many hundreds of name candidates, screening them for availability as both trademarks and domain names, and presenting multiple rounds of names to the client. We always counsel our clients to submit several name candidates to their attorneys for a full legal search, since roadblocks to use of a name can come up in unexpected ways. The fee we charge represents not only our creative work – the "ideas" for names – but also our due diligence in screening names exhaustively to ensure that they are available for use, and our strategic thinking on the appropriateness of the brand in this space.

26. While a good name may help drive business, it would be difficult to derive an exact ROI for the name of a business. In the case of Bettie Page Clothing, the name was certainly a good choice, being consistent with the brand, but if a licensing deal had not been arranged, it would be worth nothing.

27. It is also important to understand that a good name cannot guarantee success. If a company puts out a shoddy product, or had terrible customer service, the best name in the world will not keep the business going. Likewise, a bad name will not "kill" a good business, if customers feel they are getting a good value for their money. (A good example of this is the Wii, a name that was

universally panned when announced, and now one of the biggest brands in home video games.)

28. The Bettie Page name is certainly an important part of the Bettie Page Clothing brand, but it is not the sole reason for the success of the company. It would be wildly overstating its importance to claim that the name is worth millions of dollars.

29. If Catchword was assigned this project, we would have suggested many other names in addition to names of iconic women like Bettie Page. We would have cautioned the client that licensing deals can be difficult to arrange, and we would have made it clear that they should never infringe on the rights of an existing brand.

30. Catchword would not, however, have asked for or expected to receive a fee merely for casually suggesting that a client use an iconic name in connection with a business. There is no value merely in suggesting that a client use the name "Kobe Bryant" on basketballs, "John Lennon" on musical instruments, or, for that matter, "Bettie Page" on vintage dresses. We have not ever been paid for any such "work," nor would we offer such services to our clients.

31. Here, of course, Stop Staring! did not have the right to use the name "Bettie Page." Stop Staring! also did not do any of the necessary work that a business like Catchword does (as described in paragraph 26) when helping to name a client's company or product. Stop Staring! merely alleges that it suggested the use of an iconic celebrity's name. In my opinion, there is no market value for merely delivering such an idea.

32. In sum, the Bettie Page name cannot be considered a trade secret or a unique name idea, due to Bettie Page's popularity. The name was protected legally through Bettie Page's licensing company and was only available through a licensing deal. As a naming expert, I believe there is little if any market value in the mere idea of using the name "Bettie Page."


Laurel A. Sutton
Executed on February 1, 2011 in Oakland, CA

Appendix A

# Laurel A. Sutton

409 13th St., 12th Floor, Oakland, CA 94612
Phone: 510-628-0080 x105  Fax: 510-628-0090  E-Mail: laurel@catchwordbranding.com

## Professional Profile

Creating product names and company names satisfies my creative urges, while helping companies organize their names into a naming architecture allows me to put on my analytical thinking cap. For over ten years, my company, Catchword, has been helping companies big and small develop great ideas into names that command attention and engage customers. As partner, I am responsible for many aspects of business development, project management, and evangelizing the importance of naming and branding.

## Areas of Expertise

Product naming, company naming, naming architecture, naming strategy, taglines, service naming, linguistic analysis, name evaluation, name consulting

## Professional Experience

### Catchword  1998-present
- Co-founder and partner
- Project Direction for naming projects, and Director of Linguistic Analysis. Specializing in naming architecture and nomenclature systems, as well as long-term relationships with retainer clients.
- Spokesperson for Catchword in press releases, articles, speaking engagements, and networking opportunities

### Master-McNeil, Inc.  1996-1998
- Project Director: responsible for client contact, name development, screening, and presentation of work

## Education

| | | |
|---|---|---|
| University of California, Berkeley | M.A. (Linguistics) | 1992 |
| Douglass College, Rutgers Univ. | B.A. (Linguistics, English) | 1985 |

## Professional Affiliations

Member, American Name Society
Member, International Trademark Association (INTA)

## Conference Presentations

| | |
|---|---|
| 1992 | "Bitches and Skankly Hobags: The Place of Women in Contemporary Slang", Second Berkeley Women and Language Conference, UC Berkeley |
| 1993 | "Using the Net: Gender, Power, & Silencing in Electronic Discourse", COSWL Conference on the Language-Gender Interface, Columbus, Ohio |
| 1994 | "'Secondary Articulations' in Irish", Linguistic Society of America, Boston, Massachusetts |
| 1994 | "Using Usenet: Gender, Power, and Silence in Electronic Discourse", Berkeley Linguistics Society, UC Berkeley |

| 1995 | "A Gricean Analysis of Netiquette Rules", Conference on Computer-Mediated Discourse, Georgetown University Publications Collections (edited) |
| 2004 | "Evolution of US Technology Names in the 20th Century" (with Barry Cowan), American Name Society, Boston, Massachusetts |
| 2005 | "Cheddar is from Cheddar, except when it is not: Renaming geographical indicators", American Name Society, San Francisco, California |
| 2006 | "Myth and Reality of Famous Brands: How Marketing Makes a Name Brand" (with Barry Cowan), American Name Society, Albuquerque, New Mexico |
| 2009 | "Green is the New Black", American Name Society, San Francisco, California |
| 2010 | "The Name Game: Learn the Top Ten Key Success Factors from the Experts in Naming", Business Marketing Association (Northern California), Santa Clara, California |
| 2010 | "Naming & Branding Your Business to Succeed", Perfect Business Summit 2010, Las Vegas, Nevada |

## Publications
As Editor

| 1990 | *Proceedings of the Sixteenth Annual Meeting of the Berkeley Linguistics Society* (UC Berkeley) |
| 1991 | *Proceedings of the Seventeenth Annual Meeting of the Berkeley Linguistics Society* (UC Berkeley) |
| 1993 | *Working Papers in Linguistics, Volume 1: Irish* (UC Berkeley) |
| 1994 | *Cultural Performances: Proceedings of the Third Berkeley Women and Language Conference* (UC Berkeley) |
| 1999 | *Reinventing Identities: The Gendered Self in Discourse* (Oxford University Press) |

As Contributor

| 1992 | "Bitches and Skankly Hobags: The Place of Women in Contemporary Slang". In *Locating Power: Proceedings of the Second Berkeley Women and Language Conference*, 560-572. |
| 1994 | "Using Usenet: Gender, Power, and Silence in Electronic Discourse". In *Proceedings of the Twentieth Annual Meeting of the Berkeley Linguistics Society*, 506-520. |
| 1995 | "The Place of Women in Contemporary Slang". In *Gender Articulated: Language and the Socially Constructed Self* (Routledge). |
| 1996 | "Cocktails and Thumbtacks in the Old West; or, What Would Emily Post Say?" *Wired Women: Gender and New Realities in Cyberspace* (Seal Press), 169-187. |
| 1999 | "All Media Are Created Equal: Do-It-Yourself Identity in Alternative Publishing" *Reinventing Identities: The Gendered Self in Discourse* (Oxford University Press), 163-180. |
| 2010 | "Think Locally, Market Globally". In *Pure Health Magazine*, 38-39. |
| 2011 | "It Takes A Village: Global Brand Name Development for Kijiji". In *Onoma* 43 (Journal of the International Council of Onomastic Sciences) |

Expert Blogger at FastCompany.com (2010-present)

Appendix B:
Examples of 1950s advertising designs



'STRUTTIN' TIME'...A swaggering ostrich print with a full 'n' easy front-gathered
skirt 'n' a matching border print marching 'cross the yoke and belt and down the sides...A Carole King Original
of rayon Jewel Crepe. Junior Sizes 9 to 15. Under $10.00. Exclusively at one fine store in most cities

1. Dress ad in a magazine from 1947-49



2. Vintage tin sign



3. Ad for Cole bathing suits, 1952



4. Ad for Lotus shoes, late 40s – early 50s



5. Selection of Kotex ads from mid-1950s



6. More Kotex ads from 1950s-60s

Appendix C:
Examples of currently available 1950s-style design and illustration elements



7. Screenshot of 1950s designs available for illustrators and web designers at iStockphoto (as of 1/30/11)



8. Screenshot of 1950s designs available for illustrators and web designers at ShutterStock (as of 1/30/11)

# EXHIBIT E

# Rebuttal Report of Antonio R. Sarabia II
On Behalf of Defendants in
<u>Stop Staring! Designs, Inc. v. Bettie Page Clothing</u>



# Table of Contents

Section                                                                                    Page

Introduction . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

1.   Qualifications  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  1

2.   Summary of Main Opinions . . . . . . . . . . . . . . . . . . . . . . . .  4

3.   Bettie Page's fame meant that she was far from a secret . . . . . . . . . . . .  6

4.   It was not reasonable for Stop Staring! to expect sales from a
     potential customer which did not even have a retail store . . . . . . . . . . . . 8

5.   The information which Stop Staring! claims it provided BPC was not
     confidential or very valuable; but BPC provided confidential information
     to Stop Staring! . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

6.   The design elements used by BPC on its website and catalog were
     common elements in the vintage movement and not unique to Stop
     Staring!  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

7.   Eighty percent of Stop Staring!'s customers are wholesale buyers and
     they could not have been confused between Stop Staring! and BPC . . . . . 18

8.   Stop Staring! sales significantly outperformed the apparel industry
     after its communications with BPC  . . . . . . . . . . . . . . . . . . . . . 24

9.   Stop Staring! retail sales surged 1400% after BPC began retail sales  . . . . 25

10.  Business bases of opinions . . . . . . . . . . . . . . . . . . . . . . . . . . 26

11.  Conclusion  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27


Exhibit A - Resume . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .28

Exhibit B - Publications . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 31

Exhibit C - List of Sources . . . . . . . . . . . . . . . . . . . . . . . . . . . . 34

Exhibit D - The Vintage Apparel Color Palette . . . . . . . . . . . . . . . . . . . . . . . . 35

Exhibit E - Examples of Vintage Design Elements, pre-2004 . . . . . . . . . . . . . 37

Exhibit F - Stop Staring!'s Astounding Retail Sales Growth . . . . . . . . . . . . . . 52

E:\EXP\rebuttal\tatanya

ii

## Introduction

This case involves a segment of the apparel business which focuses on vintage clothing, specifically designs copied from and inspired by styles of the 1940's and 1950's. This  vintage style is closely associated with rockabilly music (a blending of rock and roll and hillbilly musics) as well as with 1950's car culture. As with many movements, it is difficult to pinpoint an exact time when it began.  One point often picked is 1978 when Belier Press began to reprint photographs of the leading symbol of this style: the model Bettie Page.  However, it was some years, the late 1990's, when this vintage style really begin to bubble up through a number of clothing lines which became increasingly popular. Plaintiff Stop Staring! Designs was one of these clothing companies which grew from the late 1990's. Stop Staring! was primarily a wholesaler of clothing. This meant that it focussed its sales efforts on retailers. This case arose from the communications between Stop Staring! and a potential customer, the defendants ("BPC"). Stop Staring! did not make any significant sales to BPC, despite communications about sales which occurred over several months.  While rebutting the reports of Dr. Frazier and Mr. Wunderlich, this report will analyze the communications between Stop Staring! and BPC from the perspective of the apparel and licensing businesses.


## 1.    Qualifications

For twenty-five years I have worked in the apparel sportswear (casual clothing)

business as a business person and attorney.  For nine years I was employed full time by a leading sportswear company, Guess?, Inc.  During my employment at Guess, I constantly participated in and made management decisions about brand and design development and protection involving: (a) which designs and marks were original and protectable; (b) registration of copyrights and trademarks; and (c) the enforcement of legal rights to brands and designs.  I worked closely and frequently with the design, advertising and financial departments.  With each of these departments I was involved with policies, contracts and management decisions.   I regularly saw how apparel and fabric designs were inspired  and created.  I coordinated with the advertising department to protect its creations.  I was frequently in apparel factories so that I became familiar with the manufacturing of garments from the ordering of component parts, such as fabric and trim (labels, buttons and rivets), through fabric cutting, garment assembly, final garment preparation (such as removing loose threads), packaging, and shipping.


I have been intimately involved with fast-growing apparel companies, first as an employee during my 9 years at Guess and later while working with Earl Jean as outside general counsel.


Since 1984 I have specialized in the evaluation and development of copyright and trademark portfolios for apparel and sportswear companies.  I create worldwide trademark

plans for companies.  I have managed trademark portfolios with thousands of marks.  I advise apparel companies on whether new designs for fabric prints, labels, tags and decorative stitching are sufficiently different from their sources of inspiration to be original. I have met with individual designers and conducted seminars for design departments on originality.  I have worked closely with prominent apparel designers.

My intellectual property and corporate work have encompassed large companies (Nike, Guess, Gymboree, Dooney & Bourke and Microsoft)  and young companies in their early growth stages such as Earl Jean.

Also, over the last twenty-five years, I have continuously worked in apparel brand licensing.  I have participated in thousands of licensing negotiations, culminating in dozens of licenses.  This participation included negotiation of all of the business points of the licenses.  I have chosen licensees from among many candidates.  I selected the countries and products into which the licensing of a brand should be expanded.  I was vice-president of the licensing department of an apparel company the licensing revenues of which were in the millions  of dollars.  I have worked with and negotiated numerous distribution and licensing agreements in Asia and Latin America including those involving Brazil,  Argentina and Panama, among other countries.  I have traveled to and inspected licensee operations abroad.  I have reviewed licensee and distributor performance.   I regularly advise clients about licensing as a means to expand and develop a brand.

I was retained as a licensing expert by the Vatican.

Exhibit A is my resume.  Exhibit B lists my publications in the last ten years, my compensation and other cases in which I have given expert testimony in the last four years.  Exhibit C is a list of sources used.  I also relied on my knowledge of the apparel business during my twenty-five years of work in this business. I may supplement my opinions, analysis or exhibits after I review additional information.  If this case goes to trial, I may use the exhibits in a larger or different (such as projection) format, as well as excerpts of any part of this report in a larger or different format suitable to a courtroom.

**2.     Summary of Main Opinions**

I am providing opinions that:

A.  Ms. Estrada, one of the principals of Stop Staring!, was correct when she testified that Bettie Page was iconic, instantly recognizable and well known as the star of the vintage movement. By 2005, there was nothing secret in the apparel industry about the Bettie Page name and its desirability for use on clothing.

4

B.  It is not unusual for wholesale sellers, such as Stop Staring!, to be disappointed when their best sales pitch is unsuccessful. However, it is well known in the apparel industry that a good percent of sales pitches to potential retail customers are not successful.

C.  Under apparel industry practices, it was not reasonable for Stop Staring! to expect, let alone rely upon, sales to BPC.

D.  From the first meeting in February 2006, Stop Staring! could not have reasonably believed that communications by it to BPC would lead to sales, because BPC did not even have a store.

E.  The information allegedly provided by Stop Staring! to BPC was not confidential or valuable.

F.  The communication between Stop Staring! and BPC was a two-way street on which BPC provided confidential information to Stop Staring!.

G.  The design elements used by BPC on its website and catalog were common

elements in the vintage movement and were not unique to Stop Staring!.

   H.   Wholesale apparel buyers are extremely unlikely to be confused between Stop Staring! and BPC.

   I.   Stop Staring! sales significantly outperformed the apparel industry after its communications with BPC; Stop Staring!'s retail sales growth was amazing.

   J.   The vintage apparel market is not mature and includes companies other than BPC and Stop Staring!.

**3.   Bettie Page's Fame Meant that She was Far From a Secret**

Stop Staring!'s CEO, Ms. Estrada, repeatedly and correctly testified that Bettie Page was an "icon," "instantly" recognizable and "well known."[1] Since the vintage clothing business is Stop Staring!'s business, one would expect her to be right about this and she is.

Bettie Page was well known in the 1950's as a pinup model; she was also a Playboy

---

[1] See Estrada Dep. 118: 15 - 18; 132:15 -20; 191:14 - 25; and Response to Interrogatory no. 7.

Playmate. Her second round of fame began with the re-release of many of her photographs by the Belier Press in 1978.  In the 1980's, Ms. Page was a somewhat obscure cult figure, but there was a growing interest in her.  In 1987, a magazine dedicated to her, "The Betty Pages," began distribution and increased her fame over the next seven years. She also received coverage in major media including the Los Angeles Times; the Entertainment Network (E! Channel) did a special about her.   Ms. Page's increasing fame was partly due to the growth of interest in vintage, rockabilly and the 1950's.  In the 1990's she did an interview on NBC and a Playboy interview.

By 2000, her name was well known in the apparel business; and very well known by 2005. Her fame was not limited to the apparel industry.  In fact, in early 2006, Mr. Roesler of CMG (the company with the rights to license the Page name) wrote Mr. Glaser of BPC that there were 50 million hits on www.bettiepage.com in 15 days - a huge amount and  more Internet traffic than received by Marilyn Monroe.[2]

One of Mr. Wunderlich's assumptions upon which he bases his damage calculations is that "Bettie Page" was a trade secret.[3]  Similarly, Dr. Frazier writes that  Stop Staring!

---

[2] Roesler March 2006-e-mail to J. Glaser, BP00088.

[3] Wunderlich Rpt. p. 4, ¶¶1, 2.

"shared proprietary information on the Bettie Page name."[4]  But Because Bettie Page was well known by 2005 in the fashion business, information about her was neither a trade secret nor proprietary.

### 4.     It was Not Reasonable for Stop Staring! to Expect Sales from a Potential Customer Which Did Not Even Have a Retail Store

Mr. Wunderlich's damage report is based on the assumption that there was fraud and trademark infringement.  Addressing fraud, Mr. Wunderlich writes that Stop Staring! shared information based on the understanding that BPC promised to become a retail customer.[5]  In other words, Stop Staring! claims it reasonably relied on a promise by BPC that it would become a wholesale customer.  To understand whether this is correct, it is necessary to look at the apparel business setting of the first and subsequent meetings between Stop Staring! and BPC.

Like many wholesalers, Stop Staring! participated in the February 2006 MAGIC show.  MAGIC is a huge apparel trade show in Las Vegas.  It started in 1933 as an annual apparel show hosted by the Men's Apparel Guild in California.  By 2006 it involved more than 3,600 manufacturers exhibiting 5,000 brands and private labels. More than 101,000

---

[4] Frazier Rpt. p. 9, ¶48.

[5] Wunderlich Rprt. p. 3, ¶4.

department store buyers, boutique owners and catalog merchants attended individual markets and approached wholesalers and manufacturers of virtually all types of clothing and many accessories.  The show was based at the Las Vegas Convention Center, but business  and other smaller shows spread through the Venetian, Bellagio and Mandalay Bay.  Tens of thousands of buyers (not to mention many other participants)  visited the many wholesaler and manufacturer operated booths.  Some booths are very small.  Others are mammoth with more than a dozen sales people, plus executives, assorted staff and even live entertainment. Over the five days of the show Stop Staring! would have had hundreds, if not, thousands of visits from buyers.  Any participant in MAGIC knows that the likelihood of a new visitor (as opposed to an established customer) making a purchase is low.  But there are many new visitors and the exposure is great.  The likelihood of a purchase by a visitor which does not even have a retail store at the time of its visit, such as BPC is even lower - very remote.

Wholesalers make their best sales pitch in spite of these odds. This pitch routinely includes extolling the virtues of a clothing line's fit, price points, styles, fabrics and trendiness. Many potential customers are told why the pricing is right, how good the fabrics are and why the styles are the latest fashion. These communications can take minutes to hours, depending on the situation and the sales pitch being made. A good salesperson makes the buyer feel as if he or she is receiving special information about and

insights into the clothing line. Sales pitches may start at a trade show, such as MAGIC, and resume weeks later at a company's showroom.  Ms. Estrada knew she was making a sales pitch in her communications with BPC.[6]

Manufacturers such as Stop Staring! pay thousands of dollars just for their booth at MAGIC.  On top of that are many other expenses:  personnel, travel, computer and hotel rooms, to name but a few. Almost invariably these expenses are into the tens of thousands of dollars, and often much higher. Companies like Stop Staring! pay these amounts because they hope to get new business.  They want people to come to their booth and speak with them.  Companies like Stop Staring! are soliciting business at MAGIC.

In his report, Mr. Wunderlich transforms the BPC visit to the Stop Staring! MAGIC booth into "wrongful behavior:"

> Defendants approached Stop Staring .  .  . to discuss a business venture .  .  . Defendants represented that they wanted to be a retailer of Stop Staring garments . . .  Stop Staring shared information with BP Clothing . . .[7]

---

[6] Estrada Dep. 201:8 - 19.

[7] Wunderlich Rprt. p. 3.

At MAGIC in 2006 there were 100,000 buyers doing these same deeds and thousands of sellers, like Ms. Estrada at Stop Staring!, asking these buyers to stop at their booth so that a sales pitch can be made.  Reading Mr. Wunderlich's passage makes it hard to believe that Stop Staring! solicited BPC, precisely so that Stop Staring! could give information about its line, how good it was, how well made it was and how reasonable its price was. Stop Staring! wanted to give this information because it was part of its sales pitch. Mr. Wunderlich transformed the mundane sales event into a scheme planned by the buyer; a transformation which bears virtually no resemblance to what happens at MAGIC. To put his language into perspective, Mr. Wunderlich might describe a visit to a car showroom as a "business venture"  with "representations" about "four door needs."

While it is disappointing, and sometimes bitterly disappointing, when a sales pitch conducted over weeks and several meetings does not result in sales, it is neither unusual nor unexpected in the apparel business.  In the apparel business, it is not reasonable to expect every good sales pitch to a new customer, even those conducted over weeks and several meetings, to result in a sale.  This is even truer when the buyer does not yet have a store. The vast majority of the information which Stop Staring alleges it shared with BPC occurred on March 17, 2006, before BPC had a store.[8] In February and March it would not

---

[8] Plaintiff's Response to Interrogatory no. 7, pages 9 - 11.

be reasonable for an apparel company such as Stop Staring! to expect that information provided to people without a store would lead to business.  This reasonable expectation standard applies to an apparel industry veteran like Ms. Estrada.[9]

Under the standards of the apparel business, BPC was under no obligation to disclose anything about its business during a casual first visit at MAGIC. Instead, BPC went beyond this standard and informed Ms. Estrada that it did not even have a store.[10] From this first contact in February 2006, Stop Staring! was on notice that chances of any sale to BPC were very remote.

Although BPC later signed a store lease, that had no effect on the point that it was not reasonable for Stop Staring! to expect sales in February and March.  Once the lease was signed in April, it was still not reasonable for Stop Staring! to expect sales to BPC. Although a brand-new store owner is a slightly better prospective customer than one without a store, it would still not be reasonable to expect a sale from a new store owner one met at MAGIC.

Mr. Wunderlich's assumption that there was fraud because Stop Staring! reasonably relied on a promise by BPC that it would become a wholesale customer is incorrect.

---

[9] Ms. Estrada has been involved in the apparel industry at least since 1997 and possibly much earlier. Estrada Dep. 43:22 - 44:1.

[10] Estrada Dep. 112:14 - 23.

5.   **The Information Which Stop Staring! Claims it Provided BPC was Not Confidential or Very Valuable; But BPC Provided Confidential Information to Stop Staring!**

Stop Staring! claims that it shared a variety of information and advice with BPC:

Pricing, mark up  and costing

A good fabric - bengaline

Sizing

The importance of trade shows

Mr. Wunderlich and Dr. Frazier believe these claims and base some of their conclusions upon them.[11] Ms. Estrada confirmed that it was her practice to tell buyers about pricing and fabric and even "costing."[12] Discussing "costing" means to explain how much it costs to make a garment so that the potential buyer views the wholesale price as reasonable and as likely to lead to a successful retail price. Generally, the cost of a

---

[11] Frazier Rpt. p. 9, ¶48; Wunderlich Rpt. p. 3, ¶4.

[12] Estrada Dep. 176:21 - 177:4.

garment is doubled to get the wholesale price and doubled again to set the retail price. This formula (known as keystoning) leaves enough profit margin at each level.  By Ms. Estrada's own statement this information was freely shared with many buyers, so it was hardly confidential.  Most of this information, such as an explanation of  keystoning, is readily available in books.  For example, a $65 book,  <u>Fashion For Profit: A Professional's Complete Guide to Designing, Manufacturing, & Marketing a Successful Line and Retailing</u>, explains keystoning and has significantly more information about the apparel business than was conveyed by Stop Starring! to BPC.

Mr. Ateyo testified that Stop Staring! routinely gave the many retail buyers at the MAGIC show the Stop Staring! wholesale price list[13], so that was not confidential.

The fabric name Ms. Estrada shared, bengaline, was publicly available on the Stop Staring! website, that was not confidential.

Mr. Ateyo believed that it was confidential that Stop Staring! sizes ran large (a size might say "2" but would really fit a size 4).[14]  But it is hardly news that many apparel lines are accommodating Americans' fuller figures by changing sizing - larger people still want the smaller number!  Anyone trying on clothes can readily determine the sizing used by

---

[13] Ateyo Dep. 71:8 - 72:8.

[14] Ateyo Dep. 258:1 - 21.

a particular brand.  Nothing secret about this.

While trade shows are certainly important to the apparel industry, BPC first met Stop Staring! personnel at the huge MAGIC trade show in Las Vegas - so BPC personnel already knew about trade shows. The other important trade show for the vintage business - Viva Las Vegas - is also based in the home of BPC, and was likely to be known to BPC personnel  for that very reason.

The only item exchanged between the parties which was marked "confidential" was the "Bettie Page" license which BPC readily shared with Stop Staring!.[15]  In fact, this was the only confidential information exchanged.

Ms. Estrada may have given advice and suggestions to BPC, but the advice and suggestions were not confidential.  It was common for Ms. Estrada to give advice and suggestions to retail stores.[16]

Since no confidential information was provided by Stop Staring! to BPC, any conclusions of Mr. Wunderlich and Dr. Frazier based on the transfer of confidential information are incorrect.

---

[15] Cover e-mail from J. Glaser to A. Estrada, 4/7/06, asks to keep license confidential, SSD 0102; Bettie   Page License, ¶23, "Confidentiality," SSD 0099 - SSD 0100

[16] Estrada Dep. 133:9 - 19.

6.    **The Design Elements Used by BPC on its Website and Catalog Were Common Elements in the Vintage Movement and Not Unique to Stop Staring!**

Stop Staring! has a trade dress claim for certain features of a 2004 web site and its Spring 2004 catalog: a combination of  pink and light green background, stars with uniform shapes but different sizes with rays of light, a green boomerang on a pink background with writing and curvaceous models from the 1940's and 1950's.  A review of websites which predate 2004 establishes that the following are staples of vintage trade dress:

&#10033; pastel colors: blue, green, yellow and pink

&#10033; stars

&#10033; curvaceous women

&#10033; boomerangs, typically in pastel, often with writing

These staples were not created, or even first combined by Stop Staring!. The pastel color element of the vintage look was so well known that, by 2001, paint company Sherwin Williams issued its "Suburban Modern" paint chart with these pastels. Exhibit D. The Stop Staring website with the boomerang consisted primarily of two colors from this chart: "Appleblossom" and "Holiday Turquoise."

There are a number of older websites which have combinations of these staple elements. In fact, Stop Staring! may have been aware of some of these older websites: one belonged to its customer Daddy-O's and one belonged to the trade show in which Stop Staring! participated, Viva Las Vegas. A sampling of these sites is attached as Exhibit E.

Stop Staring!'s trade dress was no more than a combination of vintage design dress staples, as was BPC's. But use of these staples is not use of something original owned by Stop Staring!.

The use of female models on a clothing web site to sell women's clothing is both functional and common throughout the apparel business.

If one considers the major background elements as dominant (because they occupy

the most space),  the BPC website has much more in common with the Viva Las Vegas

websites (combining a 2001 version with a 1999 version on Exhibit E) than the Stop

Staring! website.

Because BPC did not use any trade dress to which Stop Staring had an exclusive

right, any conclusions of Mr. Wunderlich and Dr. Frazier based on a trade dress claim are

incorrect.[17]

## 7.     Eighty Percent of Stop Staring!'s Customers are Wholesale Buyers and They Could Not Have Been Confused Between Stop Staring! and BPC

For the years 2007 through 2009, 80% of Stop Staring!'s business was wholesale.[18]

So it is not surprising that Mr. Wunderlich's damage calculations are based on the loss of

wholesales by Stop Staring! to BPC.[19] A threshold question is whether any of BPC's

wholesales were the result of confusion on the part of wholesale customers between BPC

and Stop Staring!.  Mr. Wunderlich assumes there was such confusion as a basis for his

damage computations.[20]  Dr.Frazier provided opinions that there were confusion by

---

[17]Wunderlich Rpt. p. 2, ¶2, numbered paragraphs 1 - 3; p 4, ¶¶1, 2; Frazier Rpt. p. 2, ¶ 9 -12.

[18] SSD 0539.

[19] Wundrlich Rpt. p. 2, points 1, 2 and 3.

[20] Wunderlich Rpt. p. 3, ¶4(use of Stop Staring! trademark to confuse customers).

wholesale customers.[21] It is helpful to examine apparel business practices to see if these assumptions and opinions are correct.

There are fundamental differences in how sales are made to retail customers and wholesale customers.  Retail customers may purchase on a web site or at a retail store. Web site purchases may be made without speaking with anyone by just filling out a form online. That form may not have any information about the manufacturer of the clothing. Retail store purchases are typically at stores owned by third parties, such as Nordstrom or Macy's.  Both retail web site purchases and retail store purchases can be made by a consumer who never receives any information about who owns a particular brand.  On the other hand, wholesalers are forced to learn who owns the brand by personal contact such as phone calls or meetings.  In addition, there are typically both hard copy (business cards or signs) and electronic information to the wholesalers which clearly state the brand owner.

An example of the different treatment of wholesale and retail customers is Stop Staring!'s practices.  Since at least 2008, Stop Staring!'s website has carefully segregated wholesale customers from retail customers and required steps which eliminate the possibility of any confusion over brand ownership. For example, here are the current directions to wholesale customers on the website when they click the "wholesale" button:

---

[21] Frazier Rpt. p. 2, points 9 - 12; p. 12 ¶61.

To buy Stop Staring! wholesale dresses please contact our Sales Manager, Nyleen at: Phone 213-627-1480 (Monday-Friday from 10am- 5pm pacific time) or email: nyleen@stopstaringclothing.com

To visit our showroom and view our collection of wholesale ladies dresses, wholesale prom dresses, wholesale evening dresses, wholesale formal dresses, please call nyleen for an appointment at: 213-627-1480 Or email: nyleen@stopstaringclothing.com

Regardless of whether the next contact is by phone or e-mail, there will be an introduction during which both the buyer and the Stop Staring! personnel identify themselves and their company.  This eliminates possible confusion over source.  The Stop Staring! pattern of careful segregation of wholesale buyers and retail customers predominates in the apparel industry.

Most wholesales are made to industry professionals such as store buyers and store owners.  These professionals know which companies they are buying from when they make a purchase.  If the buyer is calling, writing or visiting they know which company they are calling, writing or visiting.  At MAGIC, all booths are clearly labeled and bristling with business cards. Typically, forms such as purchase orders and invoices are exchanged

which state the name of the selling company. Professional buyers, and even first time store owners, will know which company they receive clothes from and which company they pay. Wholesale customers will not be confused based on web page design or online trademark use because verbal and written identification of the selling company will be repeatedly made to the wholesale customer.

To summarize, a wholesale buyer will not be confused over the origin of a brand because of the following:

1.  Signage identifying the brand owning company on a booth, showroom or warehouse which the buyer visits;

2.  Exchange of business cards with company identity;

3.  Personal contact;

4.  Exchange of purchase forms with company identity;

5.  Receipt of information about payment with company identity;

6.    Wholesale buyers usually seek out the seller and therefore know from where the brand originates;

7.    Many wholesale buyers are sophisticated industry professionals with a high level of knowledge about the ownership of brands in which they are interested; and

8.    Wholesale buyers are generally more careful and will make inquiries to verify ownership of brands if they are not sure.

In any particular case, some combination of these factors will eradicate any confusion on the part of a wholesale customer as to the origin and ownership of the brand. These points establish those wholesale customers making a purchase are not confused.

To expand upon point 8, if a wholesale customer is not sure about brand ownership, he or she will seek information before making a purchase. Mr. Ateyo's anecdotes about wholesale customers are consistent.  He testified that some wholesale customers recognized Bettie Page as another vintage line and inquired if it had anything

to do with Stop Staring![22] Those wholesale customers checked with Stop Staring! and were therefore not confused after their conversations with Mr. Ateyo. Not surprisingly, Mr. Ateyo did not hear that any of these customers were confused at the time of a purchase.[23] Surprisingly, Dr. Frazier relies on these anecdotes about wholesale customers who were not confused between brands to support his analysis of wholesale customer confusion.[24] These are correctly analyzed as anecdotes about wholesale customers who were careful to determine brand ownership.

The difference in analysis can be seen in an analogy. If one thinks he might be lost, then consults a map and finds his location, in my view he is not lost.  In Dr. Frazier's view he is still lost.

Eighty percent of Stop Staring!'s business for the years 2007 through 2009, could not have involved confusion between BPC and Stop Staring! related to trade dress; nor could wholesale customers have been confused over ownership of the "Stop Staring!" mark.

//

---

[22] Ateyo Dep. 207:20 - 208:7.

[23] Ateyo Dep. 210:6 - 12.

[24] Frazier Rpt. p. 12, ¶62.

8.  **Stop Staring! Sales Significantly Outperformed the Apparel Industry after its Communications with BPC**

Since the meetings between Stop Staring! and BPC, Stop Staring! has turned in dazzling sales performances relative to the apparel industry as a whole[25]:

| Year | Stop Staring! % Change | Apparel Industry % Change | Comment |
|------|------------------------|----------------------------|---------|
| 2007 | +32.7 | +3 | 10 times better |
| 2008 | +17.6 | -3.1 | Big growth while most in decline |
| 2009 | +6.4 | -5 | Still growing, most declining for 2 yrs. |

The vast majority of apparel companies would have loved to have the Stop Staring! growth after its communications with BPC. This great performance relative to the industry is at odds with the position that Stop Staring! was hurt by the market entrance of BPC and the conclusions of Mr. Wunderlich and Dr. Frazier.

//

---

[25] Sources: Stop Staring! figures - Wunderlich Rpt. p. B3; 2007 & 2009 industry - NPD Group (found at www.jamesgirone.com and retailsales.com); 2008 industry - "American Apparel & Footwear Association Annual Statistical Analysis 2008."

**9.     Stop Staring! Retail Sales Surged 1400% After BPC Began Retail Sales**

Since only the retail customers  could possibly have been confused between Stop Staring! and BPC, it is instructive to examine Stop Staring!'s retail sales after BPC entered the retail clothing business.   Did  BPC's retail sales and conduct somehow hurt Stop Staring!'s retail sales? The answer lies in the numbers.  In 2006, Stop Staring! did about $52,132 of retail sales. By 2009 its retail sales were $738,350.[26] See Exhibit E. After BPC entered the retail market in 2007, Stop Staring!'s retail sales zoomed 1,400% in the next 3 years. That is astonishingly good performance anytime - let alone in a recession. Far from being reduced after BPC entered the retail clothing market, Stop Staring!'s retail sales improved at an astounding pace.

Although this retail sales data appears in Mr. Wunderlich's Report at page B3, he fails to mention the amazing retail sales growth of Stop Staring! after BPC entered the market.  Neither Mr. Wunderlich nor Dr. Frazier address how this phenomenal retail sales growth was a "harm" caused by BPC.  If BPC caused this "harm" to Stop Staring!, there would be a long line of apparel companies asking for the same medicine.

A foundation of both Mr. Wunderlich's analysis and Dr. Frazier's is that the vintage

---

[26] SSD 0539.

apparel business is a zero sum game - any new sales by BPC means fewer sales by Stop Staring![27]  We can see this is dead wrong because retail sales at both BPC and Stop Staring! experienced substantial growth.  This zero sum game analysis has two underlying assumptions: first, that the vintage apparel market was mature by 2007 - that is, not growing.  That is not correct, that market was and is still growing.  The second underlying assumption is that BPC sales gains could not come from any of the other vintage companies, they could only come from Stop Staring!.  Neither Mr. Wunderlich nor Dr. Frazier made any attempt to prove this.  In fact, they did not even bother to refer to the other vintage apparel companies or analyze their sales -  even though Ms. Estrada provided the names: Steady, Swankys,  Lucky 13 and Lolita.[28]


## 10.   Business Basis of Opinions


My analysis and opinions about the apparel business, including business practices and trademarks in the apparel business, are based upon my knowledge of the generally accepted standards in the apparel business.  I know these standards and that these standards are generally accepted in the apparel business as a result of my extensive work in and with apparel companies during the last 25 years.

---

[27] Wunderlich Rpt. p. 2, points 1 & 3; Frazier Rpt. pp. 11, ¶59 - p. 12.

[28] Estrada Dep. 65:25 - 66:6.

## 11.   Conclusion

Mr. Wunderlich's damage calculations are based on assumptions: (a) that there was fraud (based on Stop Staring!'s reasonable expectation of future business and the provision of confidential information by Stop Staring! to BPC); (b) that wholesale customers were confused between Stop Staring! and BPC; (c) that BPC infringed Stop Staring!'s trade dress; and  (d) that the vintage market was a mature market, so sales gains by one company must come from another. These assumptions are incorrect.


Dr. Frazier opined that: (a) wholesale customers were confused between BPC and Stop Staring;  (b) that Stop Staring! suffered financially after the entry of BPC into the market, including an adverse impact on retail sales of BPC; (c) BPC obtained valuable information from Stop Staring!; (d) BPC infringed Stop Staring!'s trade dress;  and (e) the brand equity of Stop Staring! suffered from the use by BPC of trade dress owned by Stop Staring!.  I disagree with these opinions for the reasons explained above.


_____
Antonio R. Sarabia II                                         January 31, 2011

**ANTONIO R. SARABIA II**
3463 TANGLEWOOD LANE
ROLLING HILLS ESTATES, CA 90274
FAX: (310) 377 5039
PHONE: (310) 377 5171
asarabia@cox.net

R E S U M E

EXPERIENCE

1994 - Present   **Expert Witness, Consultant and Law Practice**

Emphasis on: apparel industry transactions and contracts, including sales, manufacturing, distribution and import agreements; international intellectual property, including trademarks, copyrights and infringements.

1992 - 1993   **Licensing and Trademark Counsel**

1988 - 1992   **General Counsel**

1986 - 1987   **Vice President of Licensing**

1984 - 1986   **General Counsel**

Executive with Guess?, Inc., a major international fashion company, with annual revenue of over $450 million.  Establish company policies in numerous areas including business contracts, trade secret protection, personnel, licensing, trademarks, copyrights, and litigation. Supervise, negotiate and resolve hundreds of disputes concerning contracts, commission agreements, designs, logos, copyrights and trademarks.  Confer with and advise the Board of Directors on a wide range of matters.

Work closely with senior managers in all departments including design, marketing, promotions, sales, production, import, export, trim, and piece goods.  Negotiate, prepare and review contracts for all phases of the apparel business, including operation of retail stores, foreign and domestic manufacturing, purchasing agents, sewing and cutting, fabric purchase, product display, advertising, distribution agreements, buy/sell agreements and  employment agreements. Review problems of performance in apparel contracts.

Counsel management in legal and administrative compliance in United States and overseas, including laws applicable to the garment industry, retail store operations, labor laws, U.S. customs requirements and  antitrust. Recommend, plan and supervise business litigation;  determine appropriate remedies and review of all pleadings, correspondence and settlement agreements.

Plan licensing and distribution for the Company by targeting products and countries in which to recruit licensees and distributors to increase revenue. Qualify potential licenses and distributors (analysis of current operations and management).

Nine years of experience in negotiating and writing  domestic and international trademark licenses  and distribution agreements (for apparel and other products) with a variety of countries worldwide such as Argentina, Australia, Brazil, Canada, Chile, Canada, Hong Kong, Japan, Korea and Mexico. Supervise licensing department in monitoring licensee compliance, enforcement of licenses, interpretation of licensee and licensor obligations and termination of licenses.  Participate in mediation and arbitration of licensing disputes.

Creation of an international program to control counterfeiting, diversion and unauthorized sales of garments.


1980 - 1984       **Associate**
                  Ball, Hunt, Hart, Brown and Baerwitz

Responsibilities included working with clients and addressing their various legal problems.  Diversified experience in civil and business litigation, including trials by judge, discovery, writs, appearances before regulatory agencies; commercial and real estate transactions.


1979 - 1980       **Associate**
                  Jack Heller and Associates, Realtors

A commercial real estate company.

1978 - 1979       **Associate**
                  Forster, Gemmill & Farmer
A law firm.

EDUCATION
University of Chicago Law School, J.D. June 1978
Occidental College, Los Angeles, A.B. 1974 (magna cum laude),
 Philosophy; Phi Beta Kappa
New Trier East High School, Winnetka, Illinois, 1970

BAR MEMBERSHIPS
Supreme Court of California
United States Court of Appeals for the Ninth Circuit
United States Federal District Court for the Central, Eastern,
Northern and Southern Districts of California
United States Tax Court

OTHER ACTIVITIES

Testimony in civil and criminal, state and federal cases on issues related to the
apparel industry and intellectual property.

EXHIBIT A                                          30

1.   Publications:

"How Much Do You Know about Victims' Rights?," <u>Los Angeles Daily Journal</u>, October 20, 2010.

Restitution is Often Overlooked as a Punishment for Criminals," <u>Los Angeles Daily Journal</u>, September 2, 2009.

"The Power of Victim Restitution in Civil Cases," in <u>Advocate Magazine</u>, July 2009.

"Rehashing Old Laws Won't Do More to Protect Crime Victims," in <u>Los Angeles Daily Journal</u>, January 13, 2009.

"Investigative Peril," in <u>Los Angeles Daily Journal</u>, June 27, 2007.

"Victim Restitution," in <u>California Criminal Law Procedure and Practice</u> (1998 Edition through 2010 Edition).

"Keeping An Eye on HP," in <u>Los Angeles Daily Journal</u>, December 28, 2006.

"Follow 'Falkowski' and 'Lucian' to Control Annual Bonus Programs," in <u>Los Angeles Daily Journal</u>, August 17, 2006.

"Judgment and Sentencing," in <u>California Criminal Law Forms Manual</u>, contributor (Second Edition, 2006 and updates through 2010).

"Plaintiffs Counsel as Escrow in Class Actions - It's Plain Wrong" in <u>Los Angeles Daily Journal</u>, December 16, 2005.

"Restitution," California Judges Benchguides, <u>Benchguide 83</u>, consultant (2005, 2007, 2009, 2010).

"Marked Recovery," in <u>Los Angeles Lawyer</u>, April 2005.

"Google Blithely Ignores Legal Rights of Trademark Holders," in <u>Los Angeles Daily Journal</u>, November 25, 2004.

"Shared Weight," in <u>Los Angeles Daily Journal</u>, September 25, 2003.

"Do Not Confuse Criminal and Civil Subpoeanas Duces Tecum," in <u>Los Angeles Daily Journal</u>, October 16, 2002 (co-author with William Kopesky).

"Restitution Bind - The Harvest Court Performed Legal Gymnastics and Ignored Precedent," in Los Angeles Daily Journal, September 5, 2001.

"Forgotten Citizens," in Los Angeles Daily Journal, April 28, 2000.

"Civil Litigators Should Consider Action for Criminal Restitution," in Los Angeles Lawyer, March 1999.

"Pay Back, California's Restitution Statute," in Los Angeles Daily Journal, August 26, 1996.

**Panels**

"Victims' Rights and Restitution: Whose Case Is It?" 82nd Annual Meeting of The State Bar of California, September 10, 2009.

"Prop. 9 and Victims' Rights:  How it impacts charging, trial decisions, sentencing, parole and restitution," Fidler Institute on Criminal Justice, Loyola Law School, May 1, 2009.

"Protecting Victims' Rights in California: How Should it be Working?" Panelist, Loyola Law School, November 5, 2010.


2.      Compensation:  $600 per hour.


3.      Deposition and trial testimony within the last four years:

        Jivago v. Kleinberg, SC099941,  Los Angeles County Superior Court, 2010.

        Callan v. Christian Audigier, Inc., C.D. Ca. CV 08-8072, 2009.

        Rosmarin v. Buchalter,  Jams  Arbitration, Orange County  No. 1200040434, 2009.

        Citizens of Humanity v. Caitac, #38090,  Los Angeles County Superior Court, 2008.

        Cassel v. Wasserman, #LC070478, Los Angeles County Superior Court, 2008.

        Bayer Clothing Group v.  Sears, N.D. Il. #07CV2395, 2008.


Exhibit B                                                                     32

SPI Manufacturing v. Pacific Sunwear, #06CC04289, Orange County Superior Court, 2008.

Mourad v.  Lada Jeans, C.D. Ca. Case# CV06-2649, 2007.

One Industries v.  O'Neal Distributing, S.D. Ca. Case# 06 CV 1133, 2007.

Exhibit B                                                    33

## Information and Resources Used by Antonio R. Sarabia II
## in Preparation of His Report

Third Amended Complaint and Answer

BPC Catalog

SSD Catalogs

SSD Website

Summary Judgment Pleadings including declarations and discovery excerpts

Summary Judgment Order

Timeline Exhibits

Expert Reports: Gary Frazier, Robert Wunderlich; Deposition of R. Wunderlich

SSD 0539

Internet including tools such as Google and Cooliris and websites such as unique-vintage.com, posh girl vintage.com, eBay, tarantula.com, mybabyjo.com, DaddyO's website, vivalasvegas.net, www.bettiepage.com

Case docket as of 12/19/10

Conversations with C. Arledge

Fashion For Profit: A Professional's Complete Guide to Designing, Manufacturing, & Marketing a Successful Line and Retailing, Frances Harder

Order Granting in Part and Denying in Part Defendants' Motion to Dismiss 6/09

Joint Stipulation and Protective Order

Order re Motion to Dismiss 12/09

Declaration of James Atyeo in Support of Motion to Bifurcate Trademark Infringement

Plaintiff's Responses to Interrogatories

Estrada and Ateyo depositions

Exhibit C                                                                      34



Exhibit D

## Suburban Modern

1950's

YOUR FUTURE IS BRIGHT. *With clear, cheerful colors the 1950's exhibited a new American outlook. The exuberance showed up on the walls as striking shades like Chartreuse and organic shapes like boomerangs. Whether you just feel nostalgia for those optimistic days, or you want to recreate the period in exacting detail, our Suburban palette provides the hues you desire.*

| | |
|---|---|
| Pinky Beige SW 0079 | Appleblossom SW 0076 |
| Holiday Turquoise SW 0075 | Chartreuse SW 0073 |
| Sunbeam Yellow SW 0078 | Classic French Gray SW 0077 |
| Pink Flamingo SW 0080 P1 | Radiant Lilac SW 0074 |
| Porcelain SW 0053 | Pearl Gray SW 0052 |

For interior use only.

P — Optimum color results are achieved using the designated Color-Prime.

Available only in ColorAccents.

Samples approximate the actual paint color.

Some colors limited to select product lines.

*possible palettes*

| | |
|---|---|
| WALL | Chartreuse SW 0073 |
| TRIM | Classic French Gray SW 0077 |
| ACCENT | Pink Flamingo SW 0080 |

| | |
|---|---|
| WALL | Appleblossom SW 0076 |
| TRIM | Holiday Turquoise SW 0075 |
| ACCENT | Chartreuse SW 0073 |

| | |
|---|---|
| WALL | Radiant Lilac SW 0074 |
| TRIM | Sunbeam Yellow SW 0078 |
| ACCENT | Pearl Gray SW 0052 |

www.sherwin-williams.com
1-800-4SHERWIN

©2001 The Sherwin-Williams Company
657-2655
GS 8/01

Exhibit D

36

Daddy O's Gifts & Collectibles Is Your Source For Bowling Shirts...      http://web.archive.org/web/19990220150212/www.daddyos.c...



"Where The Coolest Get Their Coolness!"

Stacy Adams Shoes!
Stacy Adams Shoes Are Coming Very Soon!

Thank You!



Betty Boop Menu



Coke Menu



Felix The Cat Menu

Marilyn Monroe Menu

Movie Memorabilia Menu

Three Stooges Menu

Elvis Menu

I Love Lucy Menu

Misc. Items Menu

Route 66 Menu

Retro Clothes For Rockabilly & Swing! Daddy-O's!          http://web.archive.org/web/20001213115500/www.daddyos.c...





Whether you're gig is rockabilly, swing, lounge
or just wanting to dress cool,
Daddy-O's has the threads for you!

Guys Threads / Dolls Threads / Back To Main

Internet Archive Wayback Machine                                    http://web.archive.org/web/*/http://daddyos.com



| Enter Web Address: | http:// | | All | | Take Me Back | Adv. Search Compare Archive Pages |

Searched for http://daddyos.com                                                                     878 Results

Note some duplicates are not shown. See all
* denotes when site was updated.
Material typically becomes available here 6 months or more after collection, with some exceptions See FAQ.

### Archived Results from Jan 01, 1996 - latest



| 1996 | 1997 | 1998 | 1999 | 2000 | 2001 | 2002 | 2003 | 2004 | 2005 | 2006 | 2007 | 2008 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 0 pages | 0 pages | 3 pages | 8 pages | 15 pages | 23 pages | 23 pages | 30 pages | 86 pages | 232 pages | 116 pages | 46 pages | 46 pages |

Internet Archive Wayback Machine

| | | |
|---|---|---|
| Nov 26, 2004 * | May 16, 2005 * | Jun 14, 2006 |
| Nov 27, 2004 | May 17, 2005 * | Jun 16, 2006 |
| Nov 28, 2004 | May 18, 2005 | Jun 22, 2006 |
| Dec 04, 2004 * | May 19, 2005 * | Jun 23, 2006 * |
| Dec 07, 2004 | May 21, 2005 * | Jun 30, 2006 * |
| Dec 08, 2004 | May 22, 2005 | Jul 01, 2006 |
| Dec 11, 2004 | May 23, 2005 | Jul 11, 2006 * |
| Dec 12, 2004 | May 24, 2005 * | Jul 12, 2006 |
| Dec 14, 2004 * | May 25, 2005 | Jul 13, 2006 |
| Dec 15, 2004 * | May 26, 2005 * | Jul 16, 2006 * |
| Dec 16, 2004 | May 27, 2005 | Jul 18, 2006 |
| Dec 29, 2004 * | May 28, 2005 * | Jul 19, 2006 |
| Dec 30, 2004 | May 29, 2005 | Jul 20, 2006 |
| | May 30, 2005 | Aug 13, 2006 * |
| | May 31, 2005 | Aug 14, 2006 |
| | May 31, 2005 * | Aug 15, 2006 |
| | Jun 01, 2005 | Aug 16, 2006 * |
| | Jun 02, 2005 | Aug 20, 2006 * |
| | Jun 03, 2005 * | Aug 21, 2006 |
| | Jun 04, 2005 | Aug 23, 2006 |
| | Jun 05, 2005 | Aug 24, 2006 * |
| | Jun 06, 2005 | Aug 25, 2006 |
| | Jun 07, 2005 * | Aug 30, 2006 * |
| | Jun 09, 2005 | Sep 01, 2006 * |
| | Jun 09, 2005 | Sep 03, 2006 |
| | Jun 10, 2005 * | Oct 04, 2006 * |
| | Jun 11, 2005 * | Oct 15, 2006 * |
| | Jun 12, 2005 | Oct 27, 2006 * |
| | Jun 13, 2005 | Nov 03, 2006 * |
| | Jun 13, 2005 * | Nov 09, 2006 |
| | Jun 14, 2005 | Nov 14, 2006 * |
| | Jun 15, 2005 * | Nov 19, 2006 |
| | Jun 16, 2005 | Nov 25, 2006 |
| | Jun 17, 2005 * | Dec 06, 2006 * |
| | Jun 18, 2005 | Dec 08, 2006 * |
| | Jun 19, 2005 | Dec 12, 2006 |
| | Jun 20, 2005 | Dec 15, 2006 * |
| | Jun 20, 2005 * | Dec 17, 2006 |
| | Jun 21, 2005 | Dec 20, 2006 |
| | Jun 22, 2005 | Dec 23, 2006 * |
| | Jun 23, 2005 * | Dec 25, 2006 |
| | Jun 24, 2005 | Dec 31, 2006 |
| | Jun 25, 2005 * | |
| | Jun 26, 2005 | |
| | Jun 27, 2005 | |
| | Jun 28, 2005 | |
| | Jun 29, 2005 | |
| | Jun 30, 2005 | |
| | Jul 01, 2005 * | |
| | Jul 02, 2005 * | |
| | Jul 03, 2005 | |
| | Jul 05, 2005 | |
| | Jul 06, 2005 * | |
| | Jul 07, 2005 | |
| | Jul 08, 2005 | |
| | Jul 09, 2005 | |
| | Jul 10, 2005 | |
| | Jul 11, 2005 | |
| | Jul 12, 2005 | |
| | Jul 13, 2005 * | |
| | Jul 14, 2005 * | |
| | Jul 15, 2005 | |
| | Jul 16, 2005 * | |
| | Jul 17, 2005 | |
| | Jul 18, 2005 | |
| | Jul 19, 2005 * | |
| | Jul 20, 2005 * | |
| | Jul 21, 2005 * | |
| | Jul 23, 2005 * | |
| | Jul 24, 2005 | |
| | Jul 25, 2005 | |
| | Jul 26, 2005 | |
| | Jul 27, 2005 | |
| | Jul 28, 2005 | |
| | Jul 29, 2005 | |
| | Jul 30, 2005 | |
| | Jul 31, 2005 | |
| | Aug 01, 2005 | |
| | Aug 02, 2005 * | |
| | Aug 04, 2005 * | |
| | Aug 05, 2005 | |
| | Aug 07, 2005 * | |
| | Aug 09, 2005 | |
| | Aug 10, 2005 | |
| | Aug 12, 2005 * | |
| | Aug 13, 2005 * | |
| | Aug 14, 2005 | |
| | Aug 15, 2005 | |
| | Aug 16, 2005 | |
| | Aug 17, 2005 | |
| | Aug 18, 2005 * | |

Exhibit E

40

Internet Archive Wayback Machine                    http://web.archive.org/web/*/http://daddyos.com

Aug 20, 2005 *
Aug 22, 2005
Aug 23, 2005 *
Aug 24, 2005 *
Aug 25, 2005 *
Aug 26, 2005
Aug 27, 2005
Aug 28, 2005
Aug 29, 2005
Aug 29, 2005 *
Aug 30, 2005
Aug 30, 2005 *
Aug 31, 2005
Sep 01, 2005
Sep 03, 2005
Sep 04, 2005
Sep 07, 2005 *
Sep 09, 2005
Sep 30, 2005 *
Oct 01, 2005
Oct 03, 2005 *
Oct 13, 2005 *
Oct 24, 2005 *
Oct 25, 2005
Oct 26, 2005
Oct 27, 2005
Oct 28, 2005
Oct 29, 2005 *
Oct 30, 2005
Oct 31, 2005
Nov 02, 2005
Nov 04, 2005 *
Nov 05, 2005 *
Nov 06, 2005
Nov 07, 2005
Nov 08, 2005
Nov 24, 2005 *
Nov 25, 2005
Nov 26, 2005
Nov 27, 2005
Nov 28, 2005
Nov 29, 2005 *
Nov 30, 2005
Dec 01, 2005
Dec 02, 2005
Dec 03, 2005
Dec 04, 2005
Dec 05, 2005
Dec 06, 2005 *
Dec 09, 2005
Dec 10, 2005 *
Dec 11, 2005
Dec 12, 2005
Dec 13, 2005
Dec 14, 2005 *
Dec 15, 2005
Dec 17, 2005 *
Dec 18, 2005
Dec 19, 2005
Dec 21, 2005 *
Dec 23, 2005
Dec 24, 2005
Dec 25, 2005
Dec 26, 2005
Dec 28, 2005 *
Dec 29, 2005
Dec 31, 2005

Home | Help

Internet Archive | Terms of Use | Privacy Policy

Exhibit E                                                          41

Viva Las Vegas - Rockabilly                    http://web.archive.org/web/20010720160226/http://vivalasve...



VLV 2000 Main Page                    http://web.archive.org/web/20000302175258/www.vivalasveg...



# April 20-24, 2000
# Easter Weekend

Starring Lew Williams,
Alvis Wayne, Ronnie Dawson,
High Noon, Planet Rockers,
Vernon Green & The Medallions
Plus many more Hot Rockin Acts

**Voted Best Weekender in the World by
the Rockabilly List**

'My prediction for THE event of 2000
..... the most happening, most fun
weekender in the world
.... The Shifters did a fantastic job
organising their car show at VLV
......blows everyones minds'

If you want to receive VLV email updates
please enter your email address in the
box below and hit the 'Join List' button:

Powered by ListBot

Sadie O. has very kindly set up a Viva Las
Vegas chat page. Just go to onelist.com ,
register and search for VLV.

Gold Coast

"If you took all the best Rockin'
Weekenders & added them all together,
they still wouldn't be half as good as Viva
Las Vegas. Viva Las Vegas is the Ultimate
Rockin' experience."

"The best weekender that I have ever
been to."

"VLV99 was the greatest gig I´ve ever
visited. I´ve been to Hemsby 4 times
and compared to Vegas it´s like
comparin´a Cadillac to A Vaz Lada"

"Viva Las Vegas is almost impossible to
improve. I guarantee that this will
become the premier rocking event on
planet Earth. If you missed it, leave the

Exhibit E                                    43

Internet Archive Wayback Machine                    http://web.archive.org/web/*/http://www.vivalasvegas.net



Hey Viv! Poodle Skirts and Vintage Clothing          http://web.archive.org/web/20031204141021/http://heyviv.com/



*Fun Fifties for Everyone !*

**Hey Viv !**
**Everything for a fun 50's Look !**

Poodle Skirts

**Hey Viv !**
**Put Together your**
**vintage look.**

40's & 50's
Dresses



Crinolines



Plus Size
Vintage Dresses

Cateye Glasses

Hats Gloves
Accessories

*Adult, Child, Plus Size*
*Poodle Skirts*

*Wearable & Large Size Vintage*
*Clothing*
*1940's -1950's*

Hey Viv Deals
Fancy Tights
Buy 3 & 1 Free

Poodle Appliques

**Hey Viv !**

FAQ

**Hey Viv !**

Fun 50's
Facts

at your service

**Fun to Wear**

Quick
Ship

**Vintage Clothing**

Vintage
Clothing Repair

Vintage
Jewelry Repair

Discounts

Learn More
About Vintage



Now Featuring !

**Fun & Fancy**
**Tights**

at Hey Viv !

Hey Viv Deals
Fancy Tights
Buy 3 & 1 Free

To see what's new or To
Order from the Hey Viv!
Store

Mystic
Swirls
Tights

11/23/2003

*Hey Viv! for Poodle Skirts, Crinolines & accessories for a Fun 50's Look.*

Exhibit E

45

Hey Viv! Vintage Clothing Store

http://web.archive.org/web/20010816033555/solo8.abac.com...

   



**Staten Island's Neighborhood Vintage Clothing Source Since 1987.**
**Specializing in Wearable & Large Size Vintage Clothing**
**1940's thru 1980's**

Please note that we are currently working on a new storefront on the Web. In September, the links will be in place and orders will go through the storefront. Until then, please email for availability and to place an order. Hey Viv will be closed for vacation from August 1 – August 31.

Vintage Clothing from Hey Viv ! on eBay

**What's New in Hey Viv! Vintage**

Poodle Skirts & Crinolines

Men's Fedoras

Derbys & Top Hats

[ Poodle Skirts | Vintage Accessories | Order Info | Auctions | Questions? viv@heyviv.com ]

FastCounter by bCentral

This site designed by dLester

7/20/2001

Exhibit E

46

Internet Archive Wayback Machine

http://web.archive.org/web/*/http://heyviv.com





Exhibit E

47

The Fifties Index- Oldies Music, Classic TV, Pop History, Fifties ...      http://web.archive.org/web/20021121000623/http://fittiesweb...



Internet Archive Wayback Machine

http://web.archive.org/web/*/http://fiftiesweb.com



Enter Web Address: http://   All   Take Me Back   Adv. Search Compare Archive Pages

Searched for http://fiftiesweb.com

**587 Results**

Note some duplicates are not shown. See all
* denotes when site was updated.
Material typically becomes available here 6 months or more after collection, with some exceptions See FAQ.

### Archived Results from Jan 01, 1996 - latest

| 1996 | 1997 | 1998 | 1999 | 2000 | 2001 | 2002 | 2003 | 2004 | 2005 | 2006 | 2007 |
|------|------|------|------|------|------|------|------|------|------|------|------|
| 1 pages | 6 pages | 5 pages | 9 pages | 13 pages | 17 pages | 18 pages | 27 pages | 76 pages | 164 pages | 63 pages | 49 pages |

Exhibit E

49

BarsandBooths.com. Your Custom Retro Furniture and Bar Speci...   http://web.archive.org/web/20021124083913/http://www.bar...



Internet Archive Wayback Machine                    http://web.archive.org/web/*/http://barsandbooths.com



Enter Web Address: http://            [All]   [Take Me Back]

Searched for http://barsandbooths.com

480 Results

Note some duplicates are not shown. See all
* denotes when site was updated.
Material typically becomes available here 6 months or more after collection, with some exceptions. Not FAQ

## Archived Results from Jan 01, 1996 - latest

| 1996 | 1997 | 1998 | 1999 | 2000 | 2001 | 2002 | 2003 | 2004 | 2005 | 2006 | 2007 | 2008 | 2009 | 2010 | 2011 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 0 pages | 0 pages | 0 pages | 0 pages | 6 pages | 7 pages | 14 pages | 17 pages | 119 pages | 154 pages | 55 pages | 25 pages | 0 pages | 0 pages | 0 pages | 0 pages |



Exhibit E                                                                          51



Stop Staring!'s Astounding Retail Sales Growth After Bettie Page Entered the Market

1400% Growth

$738,350.00

$535,743.00

$224,266.00

$52,132.00

Sales

$800,000
$700,000
$600,000
$500,000
$400,000
$300,000
$200,000
$100,000
$0

2006    2007    2008    2009

Bettie Page Enters the Market

Years

Source: SSD539

Exhibit F

52