```
 1                   UNITED STATES DISTRICT COURT

 2                  CENTRAL DISTRICT OF CALIFORNIA

 3                              ---

 4        THE HONORABLE DALE S. FISCHER, JUDGE PRESIDING

 5

 6

 7   Stop Staring! Designs, a          )
     California corporation,           )
 8                      Plaintiff,     )
                                       )
 9   vs.                               )   Case No.
                                       )   CV 09-2014-DSF(AJWx)
10   Tatyana, LLC, a Nevada            )
     corporation, dba Bettie Page      )
11   Clothing, et al.,                 )
                        Defendants.    )
12   _____    )
     And Related Counterclaims         )
13   _____    )

14

15            REPORTER'S TRANSCRIPT OF PROCEEDINGS

16                  Los Angeles, California

17                  Monday, June 4, 2012

18

19

20

21

22   Pamela A. Batalo, CSR, FCRR, RMR
     Official Reporter
23   Roybal Federal Building
     255 East Temple Street
24   Room 181-I
     Los Angeles, California  90012
25   (213) 687-0446
```

```
 1   APPEARANCES:

 2

 3     FOR                    BROWNE, GEORGE, ROSS, LLP

 4     PLAINTIFF/COUNTER-     BY:  PETER W. ROSS

 5     DEFENDANT:             2121 AVENUE OF THE STARS

 6                            SUITE 2400

 7                            LOS ANGELES, CA 90067

 8

 9     FOR                    ONE LLP

10     DEFENDANTS/            BY:  CHRISTOHER W. ARLEDGE

11     COUNTERCLAIMANTS:      4000 MACARTHUR BOULEVARD

12                            W. TOWER, SUITE 1100

13                            NEWPORT BEACH, CA 92660

14

15

16

17

18

19

20

21

22

23

24

25
```

```
 1              Los Angeles, California, Monday, June 4, 2012

 2                            2:09 p.m.

 3                             -oOo-

 4              THE COURT:  Calling Item No. 11, CV 09-2014-DSF(AJWx),

 5    Stop Staring! Designs vs. Tatyana, LLC.

 6              MR. ROSS:  Good afternoon, your Honor.  Peter Ross for

 7    the plaintiffs.

 8              MR. ARELEDGE:  Good afternoon.  Chris Arledge for the

 9    defendants.

10              THE COURT:  I can't believe you can't settle this

11    case.  Seriously.  I don't know.

12              Mr. Arledge, I am going to start with you because I

13    don't know whether you weren't paying attention last time you

14    were here, but, you know, I read the reference to Miss Cleo and

15    was only mildly annoyed why you thought I would have any

16    interest in Miss Cleo, but, you know, Dred Scott was really

17    beyond the pale.  I can't think of why a reference to Dred Scott

18    would be used in a pleading and certainly not one involving a

19    trade dress case.  So forget the hyperbole.  I don't have time

20    for it.  None of us has time for it.  Okay?

21              MR. ARLEDGE:  Absolutely.

22              THE COURT:  At least in my court.  But I'll tell you

23    that I've never had another judge on state or federal court

24    disagree with that analysis.  I can just picture you or other

25    lawyers just saying, Great, I will throw in a Dred Scott
```

1    *reference.*  It's just -- it's not worth it.  I mean, I can't

2    focus on the merits of your case because I'm wondering what in

3    the world Dred Scott has to do with anything.

4           MR. ARELEDGE:  I apologize, your Honor.

5           THE COURT:  All right.  Just don't do it again.

6           Mr. Ross, your case gets worse by the minute.  I don't

7    know why it should go forward -- or I should take that back.  I

8    do know why it should go forward, but only as to whatever cost

9    there might be of redesigning the website, which you now note in

10   your papers was some number that frankly I don't remember

11   whether it was in the trial or not, but that's neither here nor

12   there, but if there were trade dress infringement and therefore

13   your client had to redesign the website, I can see that.  So you

14   made a reference to *Let's just* -- you know, *if you disagree with*

15   *us, your Honor, let's just go to the Ninth Circuit.*  I don't

16   think that's the solution, unless you want to deal with this

17   redesigning the website cost somehow.

18           But with regard to the alleged lost profits, I don't

19   know how that gets to the jury.  The charts that you showed at

20   trial, as I recall -- and I honestly haven't had time to go back

21   and look at them again, but it did seem to me at the time that

22   they did start with this issue in March, not April, and so now

23   that you seem to agree that we're talking about March, sometime

24   in March, not April, we don't even have the -- sort of the

25   initial hurdle that you have to get through of the timing issue,

1    never mind discounting other factors, which sadly the Ninth

2    Circuit has not yet really specified definitively.  I've read

3    the cases that you've cited and some other cases, and they're

4    somewhat helpful.  It's interesting that the Ninth does at least

5    cite to the restatement and uses that language, but I don't

6    think that's strong enough to call it a holding about what's

7    required, but it certainly makes common sense, and there are

8    several other circuits that have specified that.

9            But going to the more specific issue of Mr. Wunderlich

10    and his testimony, I'm somewhat at a disadvantage because I

11    would really like to have a list of questions that you plan to

12    ask Mr. Wunderlich if the case is to go forward at all on lost

13    profits.  I would say that, you know, the man is a numbers man.

14    He can make charts from numbers and he can show charts.  But

15    beyond that, other than showing the charts and explaining how

16    they were prepared and from what documents, I don't think he can

17    say much of anything, certainly not the one year head start

18    thing which came out of nowhere and never was supported.  I

19    don't even think testimony about something happened is really an

20    expert opinion so I really don't -- I don't know what more he

21    could say.  There really hasn't been, as I think I've said

22    before orally and in writing -- there's no testimony to suggest

23    any real confusion.  In fact, quite the opposite.

24            Your client's dedicated retailers have glowing

25    comments to make about the Stop Staring clothing, and I do

1    recall we had testimony about someone who had walked into one

2    retailer's store and wanted to return a Bettie Page dress

3    because she didn't like it, and the retailer said, *Well, that's*

4    *not Bettie Page; that's Stop Staring*, so I'm not really sure

5    what that's about, but I don't think that's enough to get us

6    anywhere.

7            And as I said, focusing on Mr. Wunderlich, other than

8    letting him simply show his charts and explain how he prepared

9    them, assuming, of course, that the case can go forward at all

10   on lost profits, I don't think he has anything that he would be

11   permitted to say.  So I guess I'll hear from you on that first.

12           MR. ROSS:  Thank you, your Honor.

13           Let me start out by saying that the reference to March

14   in our papers was a mistake.  Wherever it said March, it should

15   have been April.  We submitted a notice of errata saying that.

16           THE COURT:  Funny how that happened, though, because

17   March really was when the -- as I recall from the chart, that

18   really was what happened.  It looked like it was more toward the

19   middle or end of March than April.

20           MR. ROSS:  I don't think that's what the chart shows,

21   your Honor.  I think the chart shows spike up in April exactly

22   when they launched their website, their new website.

23           THE COURT:  Which wouldn't make any sense anyway

24   because regardless of whether you believe Jan Glaser or

25   not -- and I guess the jury didn't or they didn't like him or

1  something -- it wouldn't be simultaneous.  I mean, people don't

2  look at a website and rush out that day to go buy -- I'm not

3  even sure how you think this is working, but -- and then the

4  invoices don't get in and the orders don't get in that quickly,

5  especially since we're not talking about the retailers.

6       The retailers weren't confused.  They said they

7  weren't confused, so I'm not sure how it all tracks.

8       MR. ROSS:  I disagree with most of what the Court is

9  saying, but it's not necessary that we explain an exact

10  mechanism by which we lost sales in this case.  You can envision

11  all kinds of mechanisms.

12       I think people do buy the same day they look at a

13  website.  I think that happens all the time.  I think I do that

14  every time I go to a website with the intent of buying

15  something.

16       THE COURT:  But the sales weren't through the website.

17  The sales were through the retail stores.  I agree that you can

18  look at a website, click on it, and then your sale is made, but

19  that's not this particular instance.

20       MR. ROSS:  Well, the testimony was also at trial --

21  and this was undisputed -- that almost everyone who calls up and

22  buys from the manufacturer, all the retailers, look at the

23  website first before they buy.  They don't buy through the

24  website.  Retailers -- it doesn't make sense for retailers to

25  buy through the website.  They call up and they say how -- *do*

1   *you have ten of these dresses in stock; how soon can you get*

2   *them to my store; are there any discounts available --*

3          THE COURT:  But they weren't confused.  Your witnesses

4   said they weren't confused.

5          MR. ROSS:  There were, I think, two retailers who

6   testified -- who said they weren't confused.  I think there are

7   thousands of retailers out there.

8          THE COURT:  And none of them testified that they were

9   confused.

10         MR. ROSS:  None of them testified, so we don't have

11  that testimony in the record.  What we do have in the record is

12  exactly what the *DSPT* case says that one needs in the record to

13  prove causation and which the Court just mentioned, is just

14  common sense in terms of proving causation.

15         We have the quote from the *DSPT* case which says, *proof*

16  *of a decline in sales, combined with evidence tending to*

17  *discount the importance of other market factors, can be*

18  *sufficient to establish causal connection between the*

19  *plaintiff's decline in sales and the misconduct of the*

20  *defendant.*

21         And so what we've put on is exactly the kind of

22  evidence that the Ninth Circuit seems to believe is necessary to

23  prove a causation.  To start -- with first principles, we don't

24  have to prove anyone was actually confused to prevail.  We would

25  have to prove a cause and effect relationship to get actual

1  damages.  In proving actual damages, the *DSPT* case says this is

2  how you do it.  Rather than parade a hundred or five hundred or

3  a thousand --

4        THE COURT:  Or one.

5        MR. ROSS:  -- or a thousand retailers through --

6        THE COURT:  One.  You don't have one.

7        MR. ROSS:  -- to do it.

8        Well, in prosecuting this kind of case, I think that

9  people can appreciate how extraordinarily hard it is to call a

10  retailer in New Jersey or Mississippi or Indiana and say, *Can I*

11  *get you to fly out here to California to say you were confused?*

12  I mean, first of all, no one wants to get involved if they don't

13  have to.  Second, the people who were confused and as a result

14  started to buy from Bettie Page Clothing are people who are

15  their customers at this point, and they really don't want to

16  help us with the case.

17        THE COURT:  And they are no longer confused and they

18  are still Bettie Page customers.  I'm not sure there is evidence

19  to show that they were confused to begin with.

20        MR. ROSS:  Exactly.  That they are no longer confused

21  and they are now Bettie Page Clothing's customers, that is the

22  end result.  But initial interest confusion is actionable, and

23  all you have to do is cause a retailer to have some initial

24  interest in Bettie Page Clothing by thinking for a moment, *Hey,*

25  *I thought I was signing on to the Stop Staring website,* as 490

people did and --

          THE COURT:  There is no evidence there were 490

people.  490 hits.

          MR. ROSS:  There were 490 -- there were 490 events

where someone started out by typing in *Stop Staring Clothing* and

ended up on the Bettie Page Clothing website on the page that

says *Stop Staring Clothing*, and there is evidence in the record

that those came from all over the country when that happened.

          So we also know that people look at the website and

they buy by phoning in an order.  So it's perfectly plausible

that people were confused and started buying from Bettie Page

Clothing.  But all we have to do, according to the Ninth

Circuit, is prove that there was a decline or a flattening of

our sales, and there's, at least in the view of our expert, no

other reasonable explanation or as a matter of --

          THE COURT:  Which expert is that?

          MR. ROSS:  Dr. Wunderlich.

          THE COURT:  He's not going to testify to that.

          MR. ROSS:  Well, that's exactly what the Ninth Circuit

says he should be testifying to, is whether he --

          THE COURT:  Then they can tell me that I have to let

him do that.  He doesn't know -- he knows nothing.  He hasn't

tried to figure out what other explanation there was.  He just

said that he himself was unaware of anything.  So that's not

particularly helpful information.

1          MR. ROSS:  Well, I would disagree with that.

2          THE COURT:  Okay --

3          MR. ROSS:  He says he's not aware of anything and

4    that's in light of the fact that there was a recession at that

5    point in time.  But he looks at their sales, which are spiking,

6    even though it's a recession, and continuing to go up.  So that

7    tells him that the recession probably isn't a cause of the

8    flattening or decline in Stop Staring sales.

9          This is all a matter -- this is relevant.  It's

10   exactly what the Ninth Circuit says we should be proving, and

11   this Court might not find it persuasive.  The jury did.  But

12   it's a matter of the degree of proof and subject to

13   cross-examination, and this is how we go about proving damages

14   in this sort of case.

15         These cases are really tough in terms of finding

16   individuals and trying to add up what they would or wouldn't

17   have done had this website not been out there.  There's a whole

18   line of authority that says that, starting with the U.S. Supreme

19   Court case in *Story Parchment* where it's hard in intellectual

20   property cases to know what would have happened had they not

21   infringed, had the wrongful conduct not occurred.  This case, I

22   think, is easy on is there a likelihood of confusion.

23         THE COURT:  I do, too.  We just have different views

24   of which way it goes.

25         MR. ROSS:  Okay.  But I think there is clearly an

1    intent here to copy that is shown by copying our addresses,

2    putting *Stop Staring* on the website itself.  They came out and

3    had the meetings --

4              THE COURT:  Okay.  You're going way -- we're on

5    Wunderlich.  I'll hear from Mr. Arledge with regard to

6    Wunderlich.

7              MR. ROSS:  May I just have a moment to see if there's

8    something else I meant to address?

9              THE COURT:  Sure.

10             MR. ROSS:  Oh, the one year head start.  In my view,

11   again, that's a matter of simple economic theory that's used in

12   almost every case to prove damages.  We look at a trend as to

13   how someone's sales were before the interfering event and we

14   determine what would have happened in the absence of the

15   interfering event.

16             Here we had a trend line that Dr. Wunderlich drew out

17   showing sales increasing gradually over time.  We get to April

18   2008; spike up in sales.  And all Dr. Wunderlich is saying is

19   that if we followed the trend line out and look how long it

20   would have taken to get to that spike up in sales, it would have

21   been at least another year before they had reached that point.

22   And that's simple economic theory.  It's clear.  It's followed

23   in many, many cases, and it's something that should be allowed,

24   in my view, in this case.

25             With the Court's statement also, your Honor -- last

```
 1    point -- that there's no evidence of actual confusion, the same
 2    evidence I've been speaking of is the evidence that shows actual
 3    confusion.  We have a spike up in sales that in our view is
 4    unexplained by any other factors.  And we have a decline of our
 5    own sales after a long trend of increasing sales that happens to
 6    coincide with the wrongful behavior.  And in my view, that is
 7    evidence of actual confusion and damage, but -- plus
 8    Dr. Frazier's testimony that -- what the expected effect would
 9    be of interference or infringement under these circumstances.
10              Thank you, your Honor.
11              THE COURT:  You're welcome.
12              Mr. Arledge, the question here obviously isn't what I
13    would have done but what a jury will do, and so why shouldn't
14    this go to the jury?
15              MR. ARELEDGE:  The question actually isn't what a jury
16    would do.  Under the Lanham Act, the district court has
17    discretion to deal with monetary damages.  Even if the jury
18    makes a ruling, it's the district court's job to determine
19    whether or not the amount of damages awarded by the jury was
20    appropriate, whether it should be higher, whether it should be
21    lower, and the district court's conclusion is reviewed for an
22    abuse of discretion by the Ninth Circuit.
23              THE COURT:  Don't I have to wait for the jury to come
24    up with something to decide --
25              MR. ARELEDGE:  The jury did.  The jury did.  And what
```

1  this Court concluded rightly is there was absolutely no evidence

2  of any confusion amongst retailers.  And retailer confusion was

3  the whole basis for the damages calculation.  There's no

4  confusion.  There's no causation.  And what plaintiff's counsel

5  is promising is more of the same in the second trial.  We want

6  to put up the same evidence that this Court already saw once and

7  concluded rightly was exceedingly weak.

8          The Court doesn't have to do that.  The Court has seen

9  the evidence, and this Court can make a determination, *I'm going

10 to exercise my discretion simply not to allow a damages recovery

11 in light of the weakness of the evidence.*  You can do that.  The

12 *Skydive Arizona* case makes that very clear, one of the two cases

13 that the counsel cited in his opposition.

14          With regard to the specifics of Wunderlich --

15          THE COURT:  Just let me stop you.  So instead of the

16 new trial, you're suggesting I should just set aside the damages

17 award or reduce it.

18          MR. ARELEDGE:  The Court can absolutely do that, and I

19 think probably at this point -- and I'll add one additional fact

20 to support it in a second.  At this point, the thing that makes

21 the most sense would be for the Court to say there is simply no

22 evidence here that would support a damages award in this Court's

23 view.  No damages.

24          With regard to injunctive relief, the Court has

25 already seen the testimony.  Both parties were prepared to

1    proceed on the papers before, so there's no need for live

2    witnesses.  If the Court wants additional briefing, we can give

3    the Court additional briefing, and the Court can make a decision

4    on injunctive relief, and then in fact send us to the Ninth

5    Circuit where we'll inevitably go.

6            Now, I think that makes particular sense here because

7    in discussing trial dates with counsel, counsel has made clear

8    they won't be in a position to proceed to trial for at least

9    another year anyway because of a -- because of Ms. Estrada's

10   pregnancy and their trial schedules.  If we're going to be

11   waiting a year for trial anyway, there's plenty of time for the

12   Ninth to do what it needs to do, and there's no need to do

13   anything other than say there's not enough evidence for damages.

14   Here's a decision on injunctive relieve.  If you want to appeal,

15   fine; if you want to settle, fine.  I think that's probably what

16   should happen.

17           Mr. Ross said a lot about Mr. Wunderlich and the

18   evidence.  I think I've said all of what I would say in my

19   papers, probably with too much hyperbole and I apologize for

20   that, but there's no reason, I don't think, for me to repeat it

21   again, so unless the Court has questions about any of that, I'll

22   just rest on my papers.

23           THE COURT:  What about the cost of redesigning the

24   website?  I mean, the jury did find there was infringement, and

25   so I don't -- because I can't remember what the evidence was, if

1    any, on the cost of that so presumably the jury incorporated

2    that into its award.

3           MR. ARELEDGE:  Well, I'm not sure they did.  There was

4    no separate line item admittedly in the special verdict form,

5    but it seems clear to me based on how they decided actual

6    versus -- actual damages versus unjust enrichment that they were

7    calculating the same numbers back and forth, and it couldn't

8    have been the website redesign because then the website redesign

9    wouldn't fall on both sides of the ledger.

10          So I think best read, although admittedly there's some

11   conjecture going on, is that the jury didn't think much of it.

12   And they probably didn't because, for the life of me, I can't

13   remember really any discussion about a trial other than just a

14   quick reference to an exhibit having some numbers listed.  So

15   I'm not sure there's anything to be done there.

16          And, look, the reality is if there's no evidence

17   whatsoever that anybody was confused, the idea that a website

18   redesign had to be done because of confusion that never actually

19   reached anybody at Stop Staring headquarters doesn't really make

20   a lot of sense.  So I don't think there's any reason to proceed

21   to trial on that basis, and, in fact, plaintiff's counsel

22   doesn't seem to want to.  I mean, their papers said, *If you're

23   not going to let Mr. Wunderlich testify and let us go down this

24   lost profits road, we should go to the Ninth.*  I think that

25   makes sense.  I think that's where we should go.

1   THE COURT:  Well, I'm not saying it doesn't make sense

2   except, A, I'm required to follow the law; and, B, my colleagues

3   on the Ninth Circuit would not be amused if I simply threw up my

4   hands and said, *The parties would like to go see what you have*

5   *to say about this, so here you go.*

6   So I think there would have to be some kind of either

7   stipulation between you of what would happen with that one way

8   or another or withdrawal of that claim.  Otherwise, I think we

9   would have to go forward with the trial, and I wasn't aware it

10  was going to be a year from now.

11  And congratulations and best of luck to Ms. Estrada.

12  I wasn't aware, that I recall, that she was pregnant.  But send

13  her my good wishes.

14  But other than that, you would probably spend more

15  trying the case than it would cost to redesign the website.  The

16  amount that was in the papers seems quite extraordinary to me,

17  but if there is a way you could deal with that alternatively,

18  that would be entirely up to you, but I don't know what

19  Mr. Ross's view is on that.

20  MR. ARELEDGE:  Your Honor, I understand your point

21  actually, and what I say is that I'm not sure counsel and I have

22  ever focused on that issue.  It's been in the case, but that's

23  been the tail.  It hasn't been wagging the dog in this case.  So

24  that's something we probably could discuss if -- and maybe we

25  can find a resolution.  I don't know.

```
 1                THE COURT:  Okay.

 2                Mr. Ross, you're standing.  Is there something that --

 3                MR. ROSS:  Yes.  There is something important that I

 4   wanted to add because Mr. Arledge mentioned it again, and I

 5   realize we haven't been crystal clear on this point in our

 6   papers.

 7                The damages calculation could well be based on

 8   end-user confusion.  It doesn't have to be the retailers.  In

 9   other words, if end users are confused and they start buying

10   from Bettie Page Clothing retail outlets instead of Stop Staring

11   retail outlets, that leads to the same result in terms of a

12   spike up in Bettie Page Clothing sales and a flattening out of

13   Stop Staring sales.

14                THE COURT:  Well, you're right, Mr. Ross.  In fact, my

15   law clerk and I were sort of batting back and forth the

16   scenarios of how this would happen, and so I'm not quite sure.

17   Tell me about that.  Give me a customer and what happens in that

18   situation.

19                MR. ROSS:  A customer types in *Stop Staring* into the

20   internet and ends up on the Bettie Page Clothing site and learns

21   that there is Bettie Page Clothing out there and finds a Bettie

22   Page retailer, perhaps thinking that they're selling Stop

23   Staring dresses or perhaps by that time being enlightened, but

24   nevertheless, there being initial interest confusion because the

25   customer thought that she would be getting a dress from Stop
```

```
 1    Staring initially.  And that leads to the same result that we
 2    see in the macro evidence, a flattening out of our sales and a
 3    spike up of Bettie Page Clothing retail sales.  That happens to
 4    coincide with April 2008 when --
 5              THE COURT:  When did the site go live?
 6              MR. ROSS:  During the middle of April.
 7              MR. ARELEDGE:  April 18.
 8              MR. ROSS:  2008.
 9              THE COURT:  April 18.  So April 18 I log on to or I
10    look for Stop Staring presumably because I know what Stop
11    Staring is, to begin with, and I get sent to the Bettie Page
12    site, and I'm confused.  I think that Bettie Page either makes
13    Stop Staring dresses or sells Stop Staring dresses or something.
14    And then I what?  From that site, can I find a store that sells
15    Bettie Page, other than the Bettie Page store?  I mean, I've got
16    to do something.  I can't order the dress from Bettie Page;
17    right?  I can't click --
18              MR. ROSS:  I think that -- and I might be a little
19    confused on this because it was a few months ago that we tried
20    this case.  But Bettie Page did have a website where people can
21    order from the website, consumers can order from the website.
22    So --
23              THE COURT:  From the Bettie Page website?
24              MR. ROSS:  Yes.
25              THE COURT:  That sale is not accounted for in the
```

1    retail.  All the numbers that we got were the retail numbers.

2           MR. ROSS:  Well, it would indirectly.  What happened,

3    looking at that chart, was that in April there was a spike up to

4    about three times any previous month's sales.  And in May, it

5    doubled again.

6           THE COURT:  But let's go with my analysis.  April 18,

7    I'm on the Bettie Page site.  Let's assume for the moment I can

8    click on it or call directly to Bettie Page, which I'm not sure

9    you can do, but let's assume I can.

10          That sale isn't reflected in the sales because

11   Mr. Wunderlich listed the retail.

12          MR. ROSS:  He listed the retail sales.

13          THE COURT:  So those sales, the sales where the

14   customer called Bettie Page, confused or not, are not reflected

15   in his numbers and can't be the grounds for damages.  We don't

16   know about any of them.

17          MR. ROSS:  Again, the exact mechanism --

18          THE COURT:  No, no, no.  I just want to know what

19   you're telling me is happening --

20          MR. ROSS:  I think that's entirely possible, but I

21   think it's also entirely possible that ten people did that when

22   they called the store in Las Vegas, Nevada, and that store had

23   to order product within the week because they sold out.  *We sold*

24   *out of Bettie Page Clothing within the week*.  They don't wait

25   until the next month to order the clothing.

```
 1              THE COURT:  What store?

 2              MR. ROSS:  The store that was -- had sales boosted by

 3    the confusion on the websites.

 4              THE COURT:  It wasn't just a store.

 5              MR. ROSS:  No.  It's a thousand stores.  So this

 6    happens all over the country.

 7              THE COURT:  No, no, no.  Focus with me, if you will,

 8    on the one consumer.  I called on April 18 and ordered a dress.

 9    That's not in Mr. Wunderlich's numbers.

10              MR. ROSS:  Well, that would not be.  That one --

11              THE COURT:  Okay.  Stop.  Stop.  That's all I want to

12    know.  That's not anywhere in the numbers.

13              Okay.  Now, instead of calling Bettie Page, I say,

14    *Wow, I love the Stop Staring stuff.  Happen to be looking at*

15    *Bettie Page stuff.*  I don't know it, under your theory.  I think

16    I'm looking at Stop Staring stuff, and I want to go out and get

17    one.  I'm going to go out right now, and I'm going to find a

18    retail store that sells fill-in-the-blank.  I either want Stop

19    Staring or I think Bettie Page is Stop Staring or I think Bettie

20    Page sells Stop Staring; whatever it is, I'm confused, but I

21    know I want *the dress*.

22              So April 18 I go out, and I go to a retail store and I

23    buy a Bettie Page dress.  I wanted a Stop Staring dress and I

24    think I'm getting a Stop Staring dress, or in your analysis, it

25    doesn't matter.  Maybe I get there and I say, *Well, now I've*
```

*driven an hour to this store.  I am going to buy Bettie Page*

*even though I'd really rather have Stop Staring because here I*

*am and here's the dress.*

Okay.  So that's the consumer confusion, and that now

is impacting those retail numbers which is all Mr. Wunderlich

has given me because sometime in April -- this happened so much

that sometime in April after April 18 that these stores were so

inundated that they had to immediately call and get more dresses

from Bettie Page when they would have called Stop Staring?

MR. ROSS:  No.  They would have called Bettie Page for

more dresses, but maybe they would have called Bettie Page for

more dresses three months later, but they had a run on Bettie

Page dresses so they call in April.  And things are selling like

hotcakes now.  All they know is they're selling dresses and they

get on the phone.  That is exactly what retail stores do.  They

sell out of something in a week.  They reorder.  They reorder

promptly.  They don't wait around until the next shipment was

scheduled three months from now.  They get on the phone and they

make a reorder.  And all we know --

THE COURT:  So if that's true, if that scenario is

true, then the spike has to be no earlier -- I mean,

realistically -- than April 19 because hundreds of women did not

go into thousands of stores -- actually, it would have to be

thousands of women to go into thousands of stores throughout the

country and have this whole process occur.  So the spike has to

 1  have started no sooner than April 19 for your theory to be

 2  correct; is that right?

 3          MR. ROSS:  That would be true.

 4          THE COURT:  Okay.

 5          MR. ROSS:  And we don't have it broken down by

 6  anything other than month end.  So we know that this trend, this

 7  jump up starts in April, and over the next several months, it

 8  goes much, much higher.  And we know that nothing else changed.

 9          THE COURT:  No.  We don't know that nothing else

10  changed.  We know that when you asked Wunderlich if he was aware

11  of anything else, he said he wasn't, but I frankly don't find

12  that to be terribly relevant because he didn't say he had done

13  anything, much less what he had done.  There's no expertise that

14  he applied here that was provided either to the -- at trial or

15  apparently to counsel in advance in an expert report to explain

16  the answer to that question.

17          MR. ROSS:  Well, let me rephrase it then and say there

18  was no evidence at trial that would have explained this spike up

19  in sales other than the website going live.  There was none.

20  They talked about their attractive locations, but they had their

21  attractive locations for -- it was a year and several months.

22          THE COURT:  I understand that.  You did an excellent

23  job obviously of making that point to the jury.  So what we're

24  just talking about now is exactly how the consumer issue comes

25  into it, and I agree with you.  It is a somewhat relevant issue.

1          All right.  But there was one other -- there was some

2     point you wanted to make that had to do, I think, with --

3          MR. ROSS:  Oh, the cost of redesigning the website?

4          THE COURT:  Right.

5          MR. ROSS:  Was in the record.  Mr. Arledge pooh-poohs

6     it and says we don't -- no.  He says obviously the jury didn't

7     think that was important.

8          I don't agree with that.  The evidence was in the

9     record.  The jury made its own determination in some fashion of

10    what they believed the damage to be versus the website versus

11    the lost profits analysis.  They didn't adopt Dr. Wunderlich's

12    number.  They came up with their own number.

13         THE COURT:  Well, and if they had adopted

14    Dr. Wunderlich's number and had your redesign number, then they

15    really found not nearly as much --

16         MR. ROSS:  That could be.

17         THE COURT:  -- lost profits.

18         MR. ROSS:  That could be that they found not nearly as

19    much in lost profits as we'd asked for.

20         THE COURT:  I guess the problem with that, as I was

21    expressing before, is I don't think I have any discretion to

22    reduce the damages for redesigning the website, but I don't know

23    what, if anything, that was.  So I don't think I can just sort

24    of blithely say I'm not going to award anything for -- we'll

25    leave it as it is and I'm not going to award anything because I

```
 1   find there was no lost profits or I'm going to award minimal
 2   damages when there were minimal lost profits when I really don't
 3   know what they did with that website issue.
 4           MR. ROSS:  I don't think there is any way to know
 5   exactly what they did with that issue at this point.
 6           THE COURT:  All right.  Mr. Frazier -- is there
 7   anything you want to address with regard to Mr. Frazier,
 8   Mr. Ross?
 9           MR. ROSS:  With regard to Dr. Frazier, there are two
10   hypothetical questions in issue:  One, would Dr. Frazier expect
11   a significant number of consumers to associate the website with
12   the company given certain hypothetical facts; and second, what
13   effects would he anticipate if a competitor copied a website
14   with an effective trade dress.  And I think those are just
15   perfectly ordinary and admissible hypothetical questions to ask
16   an expert.  I don't see where they should be excluded.  I don't
17   think there is any grounds for excluding them in this case.
18   They are relevant.  I think they would assist the trier of fact.
19           THE COURT:  All right.
20           Mr. Arledge?
21           MR. ARELEDGE:  Your Honor, the fundamental problem
22   with Dr. Frazier is that they didn't do any analysis.  They did
23   none.  For him to opine as to what consumers believed about the
24   Stop Staring trade dress, what effect it had on them or what
25   effect it might have had on their buying habits is pure
```

```
 1    speculation.  That was the point of the earlier motion in limine
 2    practice where this Court pointed out he hasn't done any
 3    analysis.  He's just parroting the plaintiff's position.  And
 4    that's what he did.  They only change it around.  Instead of him
 5    saying, In my professional opinion, in this case people were
 6    confused and they started to buy from Bettie Page instead,
 7    instead they just say, Well, hypothetically, what do you think
 8    happened?  He said, Hypothetically that's what happened.  So
 9    it's the same problem.
10               THE COURT:  All right.  Thank you.
11               Mr. Arledge, now we're at the consumer confusion
12    issue, and we've had sort of a lengthy discussion, and I do
13    agree with Mr. Ross that the consumer confusion, to the extent
14    it existed, would arguably have some impact on retail sales.
15    And certainly Ms. Estrada will not be testifying that millions
16    saw her site, but other than that, what are you hoping that I
17    would curtail here that still allows the plaintiff to make that
18    legitimate connection between potential consumer confusion and
19    the sales?
20               MR. ARELEDGE:  Well, if you want to get to damages
21    based on consumer confusion, what you have to have is evidence
22    of consumer confusion.  The reason they focused on retailers, I
23    believe, is because they either did not want to pay for a
24    consumer confusion survey, or they did one and didn't like the
25    results and so they didn't use it.  Either way, it gets you to
```

1   the same point.

2          You don't get to say, *Okay, we haven't shown that*

3   *retailers were confused, but hypothetically what if a bunch of*

4   *consumers were confused instead.  That might have affected who*

5   *the retailers buy from; therefore, on solid ground.*  No you're

6   not.  There's still no evidence anywhere of consumer confusion.

7          That's the sort of evidence that you accumulate during

8   the discovery phase, usually through surveys.  There isn't any

9   of that.

10          I would also point out, I'm not sure I even understand

11   the theory in my head, but if I understand what counsel is

12   saying, he is saying that on April 19, there is mass confusion

13   amongst consumers.  And these people immediately rush to some

14   retailers and insist on buying Bettie Page dresses rather than

15   Stop Staring dresses.  I don't know how they do that.  Counsel's

16   whole argument all along is that these dresses are identical so

17   I'm not sure how you would distinguish between the two.  Let's

18   say you can't.

19          April 19 through the end of April, there is a mad

20   rush, retailers are overwhelmed with consumers who are confused.

21   They don't know who they are buying from but somehow they manage

22   to express their reference for Bettie Page rather than Stop

23   Staring dresses.  I don't know how that works, but I'll assume

24   it.  And then what happens is that retailers immediately start

25   to order vast quantities of Bettie Page dresses and less

1   quantities of Stop Staring dresses, and those sales manage to

2   close before the end of April when Mr. Wunderlich's chart shows

3   a spike.  That's not even coherent.  There's certainly no

4   underlying evidence for it, but you have to have something.

5   It's not enough to say, *Well, you're right.  We failed utterly*

6   *to show retailer confusion, but we think maybe some consumers*

7   *might have been so we should still be okay.*  That's what they're

8   trying to do.  It doesn't make sense.

9          There's a reason why this theory wasn't logged in

10   until the opposition to the Wunderlich motion in limine.  It's

11   because it doesn't make any sense.

12          THE COURT:  Mr. Ross?

13          MR. ROSS:  Just for purposes of the balance of this

14   argument, every time Mr. Arledge says Stop Staring failed

15   utterly to prove retailer confusion, my response each time is

16   that the evidence of actual confusion is the spike up in their

17   sales to the flattening of our sales and no evidence of anything

18   else that changed.

19          THE COURT:  Well, I will stipulate that that would be

20   your response.

21          MR. ROSS:  Okay.  That's the only thing I would add.

22          THE COURT:  Okay.  Certainly 221 created pitfalls for

23   the unwary, the *unwary* being the Court in this case, and so 221

24   doesn't seem like something that should be used in the future or

25   will have to be used in a very different way.  I think counsel

1    took advantage, as good counsel do, of the Court's good graces,

2    and that certainly can't be used in that way.

3          I'm certainly -- I am a little bit sorry Ms. Estrada

4    isn't here, but certainly before the time of the next trial, if

5    there is one, she will have to come in and I will have to have a

6    heart-to-heart talk with her and explain to her how displeased I

7    was that she ignored my orders during the last trial and how she

8    will be sanctioned if she disobeys them in the next trial

9    because she is a very smart woman, as we all observed, and she

10   clearly understood what she wanted to get in and she clearly

11   understood what I wasn't allowing in.  I'm going to take a

12   different approach next time, if there is a next time.

13          Evidence of copying, that's granted.  Again, she can't

14   just keep throwing her case to the jury, and the way in which

15   the dresses were referred to I think overbore the true content

16   of this trial.  It was not about copying dresses, and I think --

17   I mean, I'm not sure how one really avoids this.  I gave a jury

18   instruction -- maybe it needs to be more detailed -- but I think

19   it's hard to separate out copying of dresses, which to the

20   extent it occurred, was entirely proper and was in fact what

21   Ms. Estrada had done from copying of trade dress, so we'll all

22   have to figure out a way to address that better in the future.

23          And the description of the trade dress, again that --

24   that got away from me.  The trade dress will be the trade dress

25   described in paragraph 55 of the Third Amended Complaint unless

```
 1    the parties stipulate otherwise, and counsel is going to have to
 2    be careful to make sure that that's the trade dress they're
 3    talking about because I think we -- it got presented as sort of
 4    little bits and pieces and sort of whatever aspects of it that
 5    counsel wanted to describe, and even though the phrase look and
 6    feel was used, we got way far away from the total look and feel
 7    of what plaintiff claimed the trade dress was, so in any future
 8    trial, that's going to have to be dealt with more specifically.
 9            I will issue a written ruling.  I frankly don't know
10    what I'm going to do on the causation issue at the moment, but
11    the more I think about it, the weaker it gets.  I set it aside
12    because it was against the clear weight of the evidence before,
13    and now I'm letting in less evidence so sort of logically it
14    suggests to me that the damages verdict would be against the
15    weight of the evidence again, but I am very reluctant to take
16    that issue away from the jury.  I'm going to have to look at the
17    charts again.
18            I started out by saying that something happening in
19    March or the distinction in March was my recollection, and now
20    that I've heard from Mr. Ross, I may be misrecalling it.  Maybe
21    what I was recalling was the specific distinction between
22    April 18 and the middle of April rather than the middle of
23    March, and so I'm not at all sure that March figures are
24    relevant and that -- I mean, that April figures are relevant and
25    that would throw off the whole chart.  The chart should have
```

```
 1   started not in April, but April 18 at the earliest.  Maybe
 2   April 19.  Maybe not April at all.  And so I'm not sure now that
 3   there's really, as I think of it, enough validity to a chart
 4   that includes all of April.  I will have to -- I will have to
 5   think about that.
 6            And I would urge you to discuss settlement again, but
 7   clearly there are too many personalities involved in this case,
 8   and I honestly don't know whether it's attorneys' personalities.
 9   I have sort of gotten to know you guys during the course of the
10   trial.  You're both superb lawyers.  It was a pleasure to try
11   the case.  You're both obviously excellent advocates, and I
12   don't know whether you've gotten a little bit too much involved
13   or whether you're just coming to court and portraying the
14   attitudes of your client.  Either one is perfectly all right.  I
15   have probably done both in my career, so I'm not criticizing,
16   but if it's your clients and not you, then you really need to
17   have a serious talk with them yet again.  And if it's you, then
18   maybe you ought to just take a step back and think about really
19   what's best for the clients because spending the money to try
20   this case again -- and, you know, I sort of feel like I should
21   apologize for -- I guess especially to the defense -- for
22   letting in evidence that I've now concluded I shouldn't have let
23   in, but I make mistakes just like everyone else, more often than
24   I think I do, at least according to the Ninth Circuit, but
25   certainly in this case there were a few things that I should
```

1   have done differently and will do differently.  And for all I

2   know, if I do them differently, the Ninth Circuit will think

3   that the second trial was wrong instead of the first trial.

4         But I do the best I can.  But I don't know that either

5   one of you wants to continue to have this in my hands in view of

6   what I think is some real uncertainty in the Ninth Circuit case

7   law.  It really hasn't addressed this issue.  And while it did

8   mention a couple of factors in that *DPST* or whatever the name of

9   that case was, I don't think that those were the only factors,

10  and I don't think that by merely not addressing them at all,

11  plaintiff can say there was no evidence of other factors.  It's

12  plaintiff's burden to discount other factors, not the defense's

13  burden.  Plaintiff has to get over that initial hurdle, and I'm

14  not sure that's been done, but certainly the safer part, more

15  expensive for you two, but the safer part for me would be to say

16  send it the jury again and at the very least break it down so

17  they do tell me what they think of the website, and if they

18  think your number on the website is cockamamie and it should

19  have be 10,000 and you try this whole case for $10,000, nobody

20  is going to be happy.  So, again, I would urge you to try to

21  settle the case.

22        If you think there's any possibility of that, you've

23  got a lot of time before trial, I would recommend to you

24  Magistrate Judge Gandhi, who is interested in doing settlements,

25  and since you have plenty of time, maybe you can find time to

1  fit something in with him.  If you think that might be helpful,

2  I would urge you to do that.

3           Otherwise, I will issue my order on these, and you can

4  get together and give me some proposed dates for pretrial and

5  trial.

6           MR. ARELEDGE:  Your Honor, if I may, I'm not sure

7  whether I should mention it or not, but because you're

8  instructing both of us to try to settle the case, I think the

9  problem that we would have in trying to settle the case is the

10 possibility of attorneys' fees awards afterwards.  So frankly

11 that's the problem.  And it's not Mr. Ross.  It's not

12 Mr. Wesley.  I don't think it's me.  I get along with him very

13 well.  I don't think that's the issue.  So because you have

14 raised the issue, I wanted to make that note.

15          THE COURT:  Well, that's often the sticking point in

16 settling a case, and, you know, there are numerous ways to deal

17 with it.  Maybe if that's the issue, maybe you can get

18 Judge Gandhi's thoughts and help and work something out on that.

19 If you can't, I'm here, and eventually I'll have time to try it,

20 and eventually Ms. Estrada will be able to try it, and all of

21 you will clear your schedules and eventually it will get tried.

22 And somebody was very disappointed last time and somebody will

23 be very disappointed next time.  I don't know if it will be the

24 same somebody or a different somebody, but I think that's where

25 we are.  All right.  Thank you.

1                (Proceedings adjourned at 3:00 p.m.)

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

*CERTIFICATE OF OFFICIAL REPORTER*

*COUNTY OF LOS ANGELES )*
                      *)*
*STATE OF CALIFORNIA   )*

*          I, Pamela A. Batalo, Federal Official Realtime Court Reporter, Registered Professional Reporter, in and for the United States District Court for the Central District of California, do hereby certify that pursuant to Section 753, Title 18, United States Code, that the foregoing is a true and correct transcript of the stenographically reported proceedings held in the above-entitled matter and that the transcript page format is in conformance with the regulations of the Judicial Conference of the United States.*

*Date:  June 18, 2012*

*/s/ Pamela A. Batalo*
_____
*Pamela A. Batalo, CSR No. 3593, FCRR, RMR*
*Federal Official Court Reporter*