UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

# MEMORANDUM

| Case No. | CV 09-2014 DSF (AJWx) | Date | 9/13/12 |
|---|---|---|---|
| Title | Stop Staring! Designs v. Tatyana, LLC, et al. | | |

| Present: The Honorable | DALE S. FISCHER, United States District Judge |
|---|---|

| Debra Plato | Not Present |
|---|---|
| Deputy Clerk | Court Reporter |
| Attorneys Present for Plaintiffs: | Attorneys Present for Defendants: |
| Not Present | Not Present |

**Proceedings:**     (In Chambers) Order re Motions in Limine (Dkt. Nos. 285, 286, 287, 288, 289, 290)

Defendants' MIL #6

    Granted.  During the litigation of the pretrial motions in limine, Plaintiff stated that its expert, Robert Wunderlich would not testify as to causation of damages.  It later became apparent not only that Wunderlich testified as to causation, but that Wunderlich's testimony was the only evidence that Plaintiff suffered any lost profits from the alleged infringement or that Defendant received any unjust gain from that infringement.  Plaintiff's sole evidence on causation was Wunderlich's observation that Plaintiff's revenues declined and Defendants' revenues increased roughly at the same time as the alleged infringement began.[1]  The Restatement (Third) of Unfair Competition states that:

---

[1] There is some dispute as to how closely the revenue data actually tracks the alleged infringement.  The allegedly infringing website went online on April 18, 2008 and there is some suggestion that Defendants' sales increases may have happened prior to that.  It is also questionable whether Plaintiff's explanation of the evidence is at all plausible.  Plaintiff's case is based on end consumer confusion stemming from the design of a website.  But the data analyzed by Wunderlich is mostly comprised of retailer orders, not orders directly from consumers.  One would reasonably expect some lag between the time that consumers began to be confused and increased purchases by retailers to fill the increased demand for Defendants' products.  Certainly one would not expect to see a large, instantaneous effect like the one Wunderlich described at trial.

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**MEMORANDUM**

> Proof of a general decline in sales or a disruption of anticipated business growth following the defendant's misconduct can be sufficient in some cases to justify an inference of causation. However, many potential intervening factors can affect the plaintiff's sales, and the presence of such factors bears on the sufficiency of the plaintiff's proof. Proof of a decline in sales combined with evidence tending to discount the importance of other market factors, such as evidence of positive business conditions and the success of similar businesses not subject to the defendant's tortious conduct, can be sufficient to establish a causal connection between the plaintiff's decline in sales and the misconduct of the defendant.

Restatement (Third) of Unfair Competition § 36 cmt. h.

While the Ninth Circuit has not directly spoken to the issue of whether the divergent fortunes of the parties alone are sufficient to prove that trademark infringement caused a plaintiff's harm, it has recently quoted this comment from the Restatement with approval. See DSPT Int'l, Inc. v. Nahum, 624 F.3d 1213, 1224 n.41 (9th Cir. 2010). The key point to be gathered from the Restatement is that the plaintiff has to combine evidence of divergent fortunes "with evidence tending to discount the importance of other market factors, such as evidence of positive business conditions and the success of similar businesses not subject to the defendant's tortious conduct." Contrary to Defendants' suggestions, according to the Restatement, it is not up to Defendants to prove, in the first instance, that some other condition caused Plaintiff's problems (or its own success). Instead, the Restatement notes that "the presence of such factors bears on the sufficiency of the plaintiff's proof" – that is, it is part of the plaintiff's prima facie burden to discount at least some of the possible other factors that might contribute to the divergent fortunes.

The Court agrees with the approach of the Restatement. Divergent fortunes are obviously relevant evidence that trademark or trade dress infringement has harmed a plaintiff and benefitted a defendant. However, as the Restatement notes, divergent fortunes can happen for a wide variety of reasons, most of them not connected in any way with unfair competition. Thus, some onus should be placed on a plaintiff to discount at least the most obvious alternative explanations so that there can be some reasonable conclusion that the divergent fortunes were actually caused by the allegedly unfair conduct. This is analogous to the requirement of "plus factors" in antitrust parallel conduct cases. Because parallel conduct among competitors can be evidence of collusion or the result of purely independent conduct, courts require more than parallelism under section 1 of the Sherman Act. See In re Citric Acid Litig., 191 F.3d 1090, 1102 (9th Cir. 1999). Similarly, the rise of one competitor concurrent with the fall of another might be

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

## MEMORANDUM

due to trade dress infringement or it could be due to random vagaries of the market or it could be due to the rising competitor's superior product or service. For that reason, as with parallel conduct in antitrust, a plaintiff should provide some evidence that discounts alternative explanation for the observed divergence in fortunes as part of its case.

In this case, the Court does not need to decide how much evidence a plaintiff must provide to negate other explanations for the divergent fortunes of the parties because Plaintiff failed completely to provide any evidence that would discount any alternative explanations. Wunderlich was asked whether he knew of any other factors that might have caused the divergent fortunes, and he answered that he did not. But this means nothing because, as the Court has noted several times now, Wunderlich knows little to nothing about the market for women's vintage dresses, women's clothing more generally, or even the garment trade as a whole. He is an economist with no stated expertise in clothing. He was not qualified to analyze the alternative possibilities for one dress company's decline and the other's ascent. And, in any event, he did not even attempt such an analysis. The fact that someone who knows nothing about the industry cannot explain the divergent fortunes of the parties after doing no research to examine the question is of no evidentiary value at all.

Given that the only evidence with regard to causation of lost profits or unjust enrichment has been excluded, those issues will not be presented to the jury.[2] This removes the need for Wunderlich to testify. In the interest of assisting the parties, the Court will provide guidance as to how it would have ruled on other issues related to Wunderlich had he not been excluded based on the causation issue. Wunderlich could have testified in support of the summaries of the parties' financials that he created. But he would not have been allowed to testify as to the one-year head start. As discussed in the order granting a new trial, there was no foundation for Wunderlich's one-year head start theory. Wunderlich is not an expert in the field of vintage dresses or in the fashion industry more generally. He merely assumed that smooth, linear growth would be expected in this industry, even in the context of a new business such as Defendants'. Further, no basis for the one-year head start was disclosed in Wunderlich's expert report. Other witnesses were supposed to provide this foundation, but never did. Plaintiff argues that Wunderlich should, nonetheless, be allowed to testify as to these matters in the

---

[2] As discussed at oral argument, Plaintiff's damages case is not completely eliminated because it maintains a claim for the costs related to redesign of its website. Unfortunately, the form of the jury verdict does not allow the Court to determine whether the jury previously found any redesign damages, so damages will have to be retried.

**MEMORANDUM**

second trial because Plaintiff could have deposed Wunderlich about the basis for his opinions sometime between the first and second trial. This is baseless. Discovery has not been reopened, and there was no onus on the Defendants to request further discovery to make up for the fact that *Plaintiff* did not timely disclose its expert's opinions.

Defendants' MIL #7

      Granted. The Court agrees with Plaintiff that Dr. Frazier is competent to testify as to marketing issues. The problem with the posed hypotheticals is that they seek to elicit testimony from Frazier on issues that he apparently did not study in support of his testimony in this case. This is why this testimony was excluded when Frazier was to testify about it in a non-hypothetical context. As Defendants point out, had Frazier provided a foundation for his conclusions about consumer behavior, it would likely have been admitted. As it stands, Plaintiff seeks to have an expert simply parrot its theory of the case based solely on his abstract expertise with no supporting methodology or foundation.

Defendants' MIL #8

      Denied. Given the Court's ruling regarding lost profit/unjust enrichment damages, Defendants' reasons for limiting Plaintiff's confusion arguments to retailers are no longer applicable.

Defendants' MIL #9

      Denied. As the Court ruled prior to the first trial, evidence of trademark infringement is relevant to Defendants' intent. However, the Court recognizes the substantial possibility that unfair prejudice resulted from Plaintiff's repeated use of Exhibit 221 at the first trial in contexts that had nothing to do with Defendants' intent. Therefore, the Court will not allow Exhibit 221 to be used as a demonstrative exhibit for the purpose of illustrating Defendants' allegedly infringing trade dress. As discussed in the order granting a new trial, Exhibit 221 is misleading in that context because there is no evidence showing that any substantial number of people ever saw Exhibit 221 and there is no evidence that the words "stop staring" were a part of Defendants' trade dress.

Defendants' MIL #10

      Granted. The Court recognizes that intentional copying of Plaintiff's dresses by Defendants has some relevance to Defendants' intent with regard to trade dress. This is

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

## MEMORANDUM

why such evidence was admitted at the first trial, with a limiting instruction. However, Plaintiff repeatedly attempted to confuse the issues and imply that Defendants' (alleged) copying of the dresses was somehow wrongful in and of itself. This came through the unnecessary presentation of similar dresses outside of the context of the relevant trade dress, counsel's arguments, and the repeated irrelevant and unresponsive answers of Plaintiff's principal Alicia Estrada. Given this history of the first trial, reference to "copying" of dresses is excluded as the possibility of unfair prejudice strongly outweighs the minimal probative value. Defendants will be allowed to present evidence that the dresses were similar, subject to limitations if the evidence becomes unnecessarily cumulative.

Defendants' MIL #11

Granted in principle. The Court agrees that Plaintiff's trade dress needs to be defined for the jury in a more concrete way, but it is not clear that this is an evidentiary issue. Trade dress protection extends to the "overall look and feel" of trade dress. See Clicks Billiards, Inc. v. Sixshooters, Inc., 251 F.3d 1252, 1257-58 (9th Cir. 2001) ("It is well settled that restaurants and similar establishments may have a total visual appearance that constitutes protectable trade dress."). However, there are numerous reasons why a plaintiff should be made to specifically define its trade dress beyond some amorphous idea of "look and feel" that can vary from person to person. Several of these are described in Yurman Design, Inc. v. PAJ, Inc., 262 F.3d 101, 114, 116-18 (2d Cir. 2001):

> First, without a specification of the design features that compose the trade dress, different jurors viewing the same line of products may conceive the trade dress in terms of different elements and features, so that the verdict may be based on inconsistent findings.
> Second, no juror can evaluate secondary meaning, overbreadth, or nonfunctionality without knowing precisely what the plaintiff is trying to protect: [w]ithout such a precise expression of the character and scope of the claimed trade dress, ... courts will be unable to evaluate how unique and unexpected the design elements are in the relevant market.
> Third, a plaintiff's inability to explain to a court exactly which aspects of its product design(s) merit protection may indicate that its claim is pitched at an improper level of generality, i.e., the claimant seeks protection for an unprotectible style, theme or idea. The identification of design elements that compose the asserted trade dress will thus assist in winnowing out claims that are overbroad as a matter of law. We would not have been able to decide whether the trade dress claimed in Jeffrey Milstein was generic if the plaintiff had not proffered a description of what he sought to protect.

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

## MEMORANDUM

> Fourth, [c]ourts will ... be unable to shape narrowly-tailored relief if they do not know what distinctive combination of ingredients deserves protection. This case is itself a good example. And if a court is unable to identify what types of designs will infringe a trade dress, how is a competitor in the jewelry business to know what new designs would be subject to challenge by Yurman?

Id. (internal citations and quotation marks omitted).

So while "overall look and feel" is a correct statement of the law, as a practical matter it is necessary to have a more precise definition of the claimed trade dress in the context of trial and remedies. Therefore, Plaintiff's trade dress will be defined for the jury in the jury instructions. This definition should be the one from the complaint, (Third Am. Compl. ¶ 55), unless the parties stipulate to a different definition or either party can make a compelling argument for a different definition.

IT IS SO ORDERED.